851 So.2d 1119 (2003)
Clifford DAVIS, Jr. et al.
v.
Charles WITT, et al.
Nos. 2002-C-3102, 2002-C-3110.
Supreme Court of Louisiana.
July 2, 2003.
Rehearing Denied September 5, 2003.
*1121 Hon. Richard P. Ieyoub, Attorney General, Laura L. Putnam Shell, Baton Rouge, Counsel for Applicant (No. 2002-C-3102).
James L. Pate, Melissa L. Theriot, Laborde & Neuner, Lafayette, Charles V. Musso, Jr., H. David Vaughan, II, Plauche, Smith & Nieset, Lake Charles, Counsel for Respondent (No. 2002-C-3102).
Craig E. Frosch, Thomas A. Usry, John F. Weeks, II, New Orleans, Counsel for Louisiana Sheriff's Association (Amicus Curiae).
James L. Pate, Melissa L. Theriot, Laborde & Neuner, Lafayette, Counsel for Applicant (2002-C-3110).
Hon. Richard P. Ieyoub, Attorney General, Laura L. Putnam Shell, Baton Rouge, Charles V. Musso, Jr., H. David Vaughan, II, Plauche, Smith & Nieset, Lake Charles, Counsel for Respondent (No. 2002-C-3110).
Craig E. Frosch, Thomas A. Usry, John F. Weeks, II, New Orleans, Counsel for Louisiana Sheriff's Association (Amicus Curiae).
KNOLL, Justice.
In this bifurcated trial for two wrongful deaths involving two public entities, one who requested a jury trial and one who invoked its right to a judge trial,[1] we are called upon to address the duty of law enforcement personnel in a non-emergency roadway situation. Finding the sheriff's deputy acted reasonably under the facts presented in the case before us, we reverse the trial judge's findings of liability and dismiss the plaintiffs' action against Sheriff Charles A. Fuselier, Sheriff of St. Martin Parish (Sheriff's Office). With this determination, we find that the defendant truck driver's conduct was not foreseeable because his conduct was so reckless and unreasonable when, with full knowledge of the perils to the motoring public, he backed his tractor-trailer with an unlighted, dangerous load across the highway at night. He was solely responsible for causing the accident as found by the jury. Additionally, finding no ground to support the new trial ordered by the trial judge in the action against the State of *1122 Louisiana, through the Department of Public Safety and Corrections, Office of State Police (State Police), we further reverse the new trial order and reinstate the jury determination that the State Police was not liable.[2]

FACTS AND PROCEDURAL HISTORY
This tragic accident occurred on May 11, 1997, when Charles Witt, a professional trucker employed by Circle B. Trucking Company, traveled via Louisiana Interstate 10 from Lucedale, Mississippi en route to Gulf Coast Creosote Corporation, his destination in Cade, Louisiana. He drove a 1987 Freightliner tractor hauling a pole trailer loaded with sixteen creosote poles that extended seventeen feet beyond the trailer's rear axle. Before leaving his place of employment in Mississippi at 3:30 p.m., Witt affixed two large red rags to the longest poles and proceeded to his intended destination in Cade. Knowing it was illegal for him to travel with such a load at night, Witt got directions to Cade and hoped to arrive at or near his destination before dark.[3]
Unable to make sense of the written driving directions faxed to him and realizing at approximately 6:30 p.m. that he could not reach his destination before sunset, 7:51 p.m.,[4] Witt stopped in Breaux Bridge and parked his truck entirely off the road. With the help of an employee of the Food-N-Fun, Witt contacted Deputy Denise Casey, a dispatcher trainee at the St. Martin Parish Sheriff's Office, at 8:17 p.m.[5] to seek guidance on the need for an escort because the creosote poles extended quite a bit passed the end of the truck. Because of her inexperience, Deputy Casey referred the call to Sergeant Laurie Breaux, a more experienced dispatcher.
Witt told Sergeant Breaux he was located "just past Wal-Mart" in Breaux Bridge and wondered if he needed an escort through town due to his load. Sergeant Breaux acknowledged that Witt should not be on the road after sunset with the creosote poles protruding from the end of his trailer. When Sergeant Breaux realized that Witt was within the city limits of Breaux Bridge, she transferred his call to the city police department.
Witt described his situation to Michelle Mullin of the Breaux Bridge City Police Department. Witt asked whether he could get an escort through town or whether he would have to stay parked until morning. Witt also told Mullin it would be no problem for him to stay parked where he was until morning. Mullin informed Witt he would have to contact the State Police because she did not know anything about providing an escort.
Shortly thereafter, Witt contacted the State Police. Apparently the State Police told Witt they could not render assistance because he was within the Breaux Bridge city limits. All of Witt's telephone calls, *1123 except this first call to the State Police, were recorded.
At 8:46 p.m., Witt again contacted Sergeant Breaux at the Sheriff's Office seeking assistance. Sergeant Breaux told Witt the city police had to take care of his situation. According to the transcript of his second conversation, Sergeant Breaux told Witt she would call there for him and asked him to stay on the line. She then asked Witt why he needed an escort. Witt explained:
Well, here's the problem, I want to make sure that I'm not [sic] in a spot where I can get off the highway. I'm about 10 foot or maybe 8 foot off the highway right now, but with a 30 foot over hanger, 25 foot over hanger, I don't want to get hit.
Witt told Sergeant Breaux he needed someone to block traffic while he got on the road or direct him to a place where he could "pull into and get off the road." Witt further explained he needed someone to tell him of a place where he could pull his truck off the road because he did not have to leave until 8:00 the following morning. Witt expressed concern about someone hitting the poles on his truck because the portion of the poles hanging beyond the trailer's rear axle was not visible.
Although Sergeant Breaux suggested Witt could park his truck in the local Wal-Mart parking lot, Witt informed her he had already passed Wal-Mart and he could not turn around because he was hauling the seventy-foot poles. Sergeant Breaux directed Witt to the Sheriff's substation which was less than a quarter mile from where he was parked and gave him permission to turn his truck around there. She also told Witt the substation had a big parking lot, and that she would inform the substation personnel that he was headed there to turn his rig around. Sergeant Breaux then contacted Deputy Richard at the substation, and told him about Witt using the parking lot to turn his rig around. From there Sergeant Breaux thought Witt could drive to Wal-Mart for overnight parking.
Somehow Witt passed the substation and pulled his rig into the parking lot of Guidry's Specialty Meats. At this point, Witt's rig was completely off the highway and posed no danger to the motoring public. After Witt determined he could not turn around in the meat market parking lot, he walked to the neighboring home of Richard and Debbie Ducote and placed another call to Sergeant Breaux at 9:05 p.m. He told Sergeant Breaux he had not seen the substation and explained he could pull out of the parking lot, but he was afraid there would be an accident. Witt also told Sergeant Breaux he would rather be in the Wal-Mart parking lot. When Sergeant Breaux determined Witt was outside the city limits of Breaux Bridge, she transferred his call to the State Police because she thought that agency could best respond to Witt's needs for an escort.
It was 9:07 p.m. when Sergeant Breaux connected Witt with State Police Sergeant Darrell Gros, the desk sergeant on duty that night. Witt explained his predicament to the State Police and requested an escort. Sergeant Gros determined that Witt was no longer within the city limits of Breaux Bridge and asked whether Witt was completely off the roadway. Witt answered affirmatively. Witt explained that the problem with staying in the parking lot of the meat market was that in the morning he would have to back his truck onto the roadway because the lot was not big enough to turn his rig around to exit the lot. Because of the length of his load, Witt told Sergeant Gros he would rather have an escort to help him back out. Sergeant Gros informed Witt that his office could not provide an escort until the following morning and it would cost $50.00 for the escort vehicle. Although Witt could have *1124 paid the escort fee, a reimbursable expense, he declined the escort. Witt's calls to the law enforcement authorities ended at 9:11 p.m.
Witt, who was still at the Ducote home, discussed his desire to move his truck and trailer with the Ducotes. Even though Mrs. Ducote told Witt he could leave his rig in the meat market parking lot and get help from the meat market employees early the next morning, Witt insisted on moving his rig from the meat market that night and going to the Wal-Mart parking lot. Mrs. Ducote initially offered assistance, but her husband intervened and said that he would help Witt. Nevertheless, as the Ducotes looked for a flashlight, Witt boarded his rig and began backing out unassisted and without even using the emergency reflective triangles he carried in the cab of his eighteen wheeler. When Mr. Ducote saw Witt backing out unassisted, he hurriedly parked his car on the highway shoulder in an effort to illuminate the area with his headlights; he also attempted to warn the oncoming traffic by waiving his arms. Shortly thereafter, at approximately 9:15 p.m., a pickup truck occupied by Clement and Mary Davis struck the poles protruding from the trailer of Witt's tractor-trailer.[6] Clement and Mary Davis were killed as a result of the accident.[7]
The ten major children of the Davises[8] filed suit against Charles Witt, the driver of the tractor-trailer that collided with Clement and Mary's vehicle, his employer, Circle B. Trucking Company, and their insurers. The Davis children also sued Mr. and Mrs. Richard Ducote, the parties who tried to assist Witt in backing his truck from a parking lot into the roadway; the city of Breaux Bridge; Sheriff Charles A. Fuselier, Sheriff of St. Martin Parish; and the State of Louisiana, through the Department of Public Safety and Corrections, Office of State Police.
The trial court dismissed the suit against the Breaux Bridge Police on summary judgment due to lack of evidence of fault. The Davis children also voluntarily dismissed their suit against the Ducotes on the morning of trial, stipulating that the Ducotes were not at fault. Finally, prior to trial the Davis children settled the claims they brought against Witt, his employer, and their insurer.
A bifurcated trial in this matter was held on September 11, 2000 through September 15, 2000, against the two remaining defendants. A jury tried the claims against the State Police, and the district court judge tried the claims against the Sheriff's Office. The jury returned a verdict in favor of the State Police. It also answered an interrogatory, finding the Sheriff's Office free from negligence in causing the accident and further finding Witt was the sole cause of the accident and deaths of Mary and Clement Davis.[9] The *1125 jury awarded wrongful death damages in the amount of $100,000 to each of the surviving ten children of Mary Clement and $100,000 to each of the surviving ten children of Clement Davis, for a total of $2,000,000.00, and awarded damages for funeral and medical expenses.[10]
Finding comparative fault on the part of the Sheriff's Office, the trial judge assessed the Sheriff's Office fault at 20%, concurred in the jury's assessment of damages,[11] and dismissed the Davis children's claims against the State Police. The Davis children then filed a motion for judgment notwithstanding the verdict (JNOV), seeking an increase in their wrongful death damage awards and asking that 50% of the fault be assessed to the State Police. Although the trial judge denied an increase in damages, it granted the plaintiffs' JNOV, assigned 20% fault to the State Police, and conditionally granted plaintiffs' motion for a new trial should an appellate court reverse its ruling on the JNOV.
The Sheriff's Office appealed seeking a reversal of the trial judge's judgment which found it 20% at fault. The State Police appealed from the grant of the JNOV and, alternatively, the new trial that was conditionally granted. In addition, the Davis children also appealed the trial judge's allocation of only 20% fault each to the Sheriff's Office and the State Police, and further claimed the wrongful death damage awards were abusively low. A majority of a five judge panel affirmed the trial judge's assessment of 20% fault to the Sheriff's Office and increased the quantum award from $100,000 per child per parent to $200,000 per child per parent. Although the appellate court reversed the trial judge's assessment of 20% fault to the State Police on the JNOV motion, it affirmed the trial judge's alternative grant of a new trial as to the State Police. Davis v. Witt, 01-894 (La.App. 3 Cir. 11/13/02), 831 So.2d 1075.
We granted the writ applications of the Sheriff's Office and the State Police to review the lower courts' appreciation of the duty police officers owed under the facts presented. Davis v. Witt, 02-3102 *1126 (La.3/14/03), 839 So.2d 21, 02-3110 (La.3/14/03), 839 So.2d 21.[12]

DISCUSSION
We will first discuss the judge's assessment of 20% fault to the Sheriff's Office and the procedural issues pertinent thereto. We will then address the trial judge's decision to conditionally grant a new trial in the Davis children's claim against the State Police.

Trial Judge's Liability Finding: Sheriff's Office
In this bifurcated trial, the judge determined the liability of the Sheriff's Office and found it 20% at fault. Under the provisions of LA.CODE CIV. PROC. ANN. art. 1812(C)(2)(a)(i)(ii) and LA. CIV.CODE ANN. art. 2323, see n9 supra, a verdict interrogatory was propounded to the jury, who determined the fate of the State Police, relative to the fault of the Sheriff's Office and found the Sheriff's Office free from negligence. Although the verdicts of these two triers of fact appear diametrically opposed, that fact alone does not call into play the body of conflicting appellate jurisprudence regarding the proper standard of review in such cases. If the respective contradictory verdicts individually survive a review for error, then the troubling issue of harmonizing the verdicts comes into play and must be resolved.
Our first duty is the determination of whether the findings of fault made by the trial judge and jury are reasonable and not manifestly erroneous. See Powell v. Regional Transit Authority, 96-0715 (La.6/18/97), 695 So.2d 1326, 1330; Griffin v. International Ins. Co., 98-431 (La.App. 3 Cir. 10/7/98), 727 So.2d 485, 490, writ denied, (La.5/7/99), 741 So.2d 656; Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658, 665; Cornish v. State, Department of Transp. & Dev., 93-0194 (1 Cir. 12/1/94), 647 So.2d 1170, 1178, writs denied, 95-547, 95-574 (La.5/5/95), 654 So.2d 324; Felice v. Valleylab, Inc., 520 So.2d 920, 924 (La.App. 3 Cir.1987), writs denied, 522 So.2d 563, 564 (La.1988).[13] In finding the trial judge's adjudication of liability on the part of the Sheriff's Office clearly wrong, we do not reach the question of how a reviewing court must resolve conflicting verdicts in bifurcated trials, or what is called harmonizing the verdicts.[14]
*1127 The standard negligence analysis we employ in determining whether to impose liability under LA. CIV.CODE ANN. art. 2315 is the duty/risk analysis, which consists of the following four-prong inquiry: (1) Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred? (2) Did the defendant(s) owe a duty to the plaintiff? (3) Was the duty breached? (4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached? Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 321-22.
Under a duty/risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. As such, in order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). See Roberts v. Benoit, 605 So.2d 1032 (La. 1991), on rehearing, 605 So.2d 1050, 1051 (La.1991).
In Blair v. Tynes, 621 So.2d 591, 596 (La.1993), we stated that the Legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers are duty-bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La.App. 3 Cir.1991). In Mathieu, 646 So.2d at 325, this Court stated the scope of an officer's duty is to choose a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach. In Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, this Court considered the reasonableness test adopted in the Mathieu opinion, a case involving law enforcement officers in a criminal arrest setting, and extended its application to the duty of law enforcement officers who were in control of an accident scene. Syrie, 693 So.2d at 1177. We now turn to the application of that well developed jurisprudence to the facts at hand.
Reduced to its simplest terms, the trial judge imposed liability on the Sheriff's Office because Sergeant Breaux failed to dispatch a deputy to assess Witt's situation at Guidry's Specialty Meats and further failed to inform Witt that he was not to move his vehicle. Additionally, the trial judge found that Sergeant Breaux's transfer of Witt's telephone call to the State Police only confused the situation and was an incomplete response because she should have remained on the line to insure that a plan was devised to move Witt from the parking lot. These reasons comport with the expert opinion of Ken Katsaris, the expert tendered by the Davis children. For the following reasons, we find the trial judge committed an error of law because he failed to fit the duty of the dispatcher within the parameters the courts of this state have set with regard to law enforcement *1128 personnel under circumstances that do not constitute an emergency.
The underlying premise of the trial judge's imposition rested on his faulty recognition that "[a]lthough Witt's circumstances did not rise to the level of an emergency, Sergeant Breaux had enough information to believe a dangerous traffic situation would develop the same night or the next morning." Two points need be made in this regard. First, our courts have not imposed a heightened duty to police officers unless the officer has actual knowledge that a dangerous traffic situation exists. Syrie, 693 So.2d at 1177; Duvernay v. State, through Dept. of Public Safety, 433 So.2d 254 (La.App. 1 Cir.), writ denied, 440 So.2d 150 (La.1983).[15] Secondly, absent special knowledge of driver disability or impairment, we do not require police officers to anticipate the driving proclivities of people on the highway. Dubroc v. Allstate Ins. Co., 93-780 (La.App. 3 Cir. 3/2/94), 633 So.2d 861; in accord Boutin v. Perrin, XXXX-XXXX (La.App. 3 Cir. 4/25/01), 796 So.2d 691, 695, writ denied, 01-1547 (La.9/14/01), 796 So.2d 682; Persilver v. Louisiana, Dept. of Transp., 592 So.2d 1344, 1346 (La.App. 1 Cir.1991).
Generally, there is an almost universal legal duty on the part of a defendant in a negligence case to conform to the standard of conduct of a reasonable person in like circumstances. Joseph v. Dickerson, 99-1046 (La.1/19/00), 754 So.2d 912, 916; Boykin v. Louisiana Transit Co., 96-1932 (La.3/4/98), 707 So.2d 1225, 1231. Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties. Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991). Contrary to the trial judge's holding, it is well accepted that a police officer's duty is also to act reasonably under the circumstances. Syrie, 693 So.2d at 1173; Mathieu, 646 So.2d at 318.
The jurisprudence has recognized that commercial truck drivers are required to undergo testing and licensure which involve attending a special school designed to teach the mechanics and attendant hazards of operating large rigs. LeBlanc v. Steptore, 98-808 (La.App. 3 Cir. 12/9/98), 723 So.2d 1056, 1063, writ denied, 99-0087 (La.3/12/99), 739 So.2d 772. Based upon that premise, our courts have recognized that a professional truck driver is a superior actor in the eyes of the law. Stapleton v. Great Lakes Chemical Corp., 627 So.2d 1358 (La.1993); see also Mallery v. International Harvester Co., 96-321 (La.App. 3 Cir. 11/6/96), 690 So.2d 765, 768, writ denied, 97-1323 (La.9/5/97), 700 So.2d 512; Hurts v. Woodis, 95-2166 (La.App. 1 Cir. 6/28/96), 676 So.2d 1166, 1173-74; Gibson v. State Through Dept. of Transp. & Dev., 95-1418 (La.App. 1 Cir. 4/4/96), 674 So.2d 996, 1004-05, writs denied, 96-1862, 96-1895 (La.10/25/96), 681 So.2d 373, 96-1902 (La.10/25/96), 681 So.2d 374, 681 So.2d 374; Loveday v. Travelers Ins. Co., 585 So.2d 597, 603 (La.App. 3 Cir.), writ denied, 590 So.2d 65 (La.1991). Thus, with Witt's superior *1129 knowledge and training as a professional truck driver, he is held to a high standard of care to the motoring public.
As illustrated in the facts of the case sub judice, our analysis of the Sheriff's Office's actions requires an examination of the realistic expectations Sergeant Breaux had of Witt to act as a reasonable professional trucker. Although Sergeant Breaux did not tell Witt he had to remain parked out of harm's way, Witt's conversations with her speak volumes of Witt's full awareness that the presence of his rig at nighttime on a heavily traveled highway posed a danger to the motoring public and further exemplified his recognition of the need to park his rig out of harm's way for the night. Witt made Sergeant Breaux aware during their two conversations that he was a professional trucker, that he knew he had a dangerous load that could not be on the highway at night, that he needed a safe place for his load, that he did not have to reach his destination in Cade until the next morning, and that he had parked his load in a lot that was well off the highway. These facts created a realistic expectation on Sergeant Breaux's part that Witt would act in conformity with the knowledge he possessed and the duty he owed to the motoring public. Thus, it was in this context that Witt advised Sergeant Breaux that he would need assistance in backing his load from the parking lot.
In her discussion of the decision to transfer Witt's call to the State Police, Sergeant Breaux's testimony shows that she transferred Witt's call to the State Police because it was her belief that the State Police was the best agency to meet Witt's needs. Moreover, Sergeant Breaux knew the State Police had special expertise in matters involving trucking regulations and she had made such referrals to them in the past. At no time did Witt indicate to Sergeant Breaux that he would refuse State Police assistance or that he would recklessly disregard his earlier pronouncement that it was dangerous for him to back his rig onto the motoring highway with his unlighted load at night. Based upon well established jurisprudence, we find Sergeant Breaux's decision was reasonable.[16]
We find the record evidence clearly supports Sergeant Breaux's actions were reasonable and that Witt's actions were so knowingly reckless and unreasonable it rendered his conduct unforeseeable. Under these circumstances we find the trial judge clearly erred in extending the duty of the Sheriff's Office to anticipate an emergency that did not exist. When Witt contacted the Sheriff's Office, he was parked out of harm's way safely removed from the motoring public and was fully aware that he should not move his truck with an unlighted, dangerous load onto the motoring highway at night.

State Police: New Trial
As provided in LA.CODE CIV. PROC. ANN. art. 1811(C)(1), the trial judge conditionally granted the Davis children a new trial if the JNOV assessing 20% fault to the State Police was reversed on appeal. In conditionally granting this motion for new trial, the trial judge found the jury verdict was contrary to the law and evidence.
In his written reasons for judgment, the trial judge delineated two reasons in support of his determination to conditionally grant a new trial in the Davis children's action against the State Police. First, it observed the jury charges failed to instruct the jury with respect to the duty of a law enforcement officer under *1130 the circumstances similar to the subject litigation. Second, the trial judge determined the jury was either confused or mislead by the opinion testimony of George Armbruster, the State Police expert in the field of law enforcement policies and procedures.
In its assessment of the trial judge's determination, the appellate court reversed the JNOV, but found no abuse of discretion in the trial judge's decision to conditionally grant a new trial. In making this determination, the appellate court found the trial judge apparently assessed the credibility of Sergeant Gros, the State Police dispatcher, and found it lacking.
As provided in LA.CODE CIV. PROC. ANN. art.1972(1), a new trial shall be granted, upon contradictory motion, where the verdict or judgment is contrary to the law and evidence. Although the granting of a new trial is mandatory if the trial court finds the verdict is contrary to the law and evidence under LA.CODE CIV. PROC. ANN. art.1972, the jurisprudence interpreting this provision recognizes the trial judge's discretion in determining whether the evidence is contrary to the law and evidence. As this Court has stated, the decision of "[w]hether to grant a new trial requires a discretionary balancing of many factors." Davis v. Wal-Mart Stores, Inc., 00-0445 (La. 11/28/00), 774 So.2d 84 (citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir.1991)). In Davis, we explained:
Although the granting or denying of a motion for new trial rests within the wide discretion of the trial court, the discretion of the court is limited:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Gibson v. Bossier City General Hospital, et al., supra. See also Engolia v. Allain, 625 So.2d 723 (La.App. 1 Cir.1993).
Davis, 774 So.2d at 93. In considering a motion for new trial under LA. CIV.CODE PROC. ANN art.1972, "the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness." Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94 (citing Smith v. American Indem. Ins. Co., 598 So.2d 486 (La.App. 2 Cir.), writ denied, 600 So.2d 685 (La. 1992)). However, this does not mean that the trial judge can usurp the jury's fact-finding role. Martin v. Heritage Manor South, 00-1023 (La.4/30/01), 784 So.2d 627, 631.
A motion for a new trial requires a less stringent test than for a JNOV and does not deprive the parties of their right to have all disputed issues resolved by a jury. Id.[17]Compare Davis, *1131 774 So.2d at 89-90 (where we discussed the standards for determining whether a JNOV is proper). "Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence." Gibson, 594 So.2d at 1336. In considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations, and is not required to view the evidence in the light most favorable to the non-movant as on a JNOV motion. Martin, 784 So.2d at 631.
Additionally, as opposed to the granting of a motion for new trial on the grounds that the verdict is contrary to the evidence, which is directed squarely at the accuracy of the jury's factual determinations, noted federal procedural law commentators have stated that "whether the evidence presented at trial is sufficient to create an issue of fact for the jury or will permit the court to enter a judgment as a matter of law[18] is solely a question of law." CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, Vol. 9A, § 2524, p. 249 (West 1995). These commentators have further explained the differences between motions for a judgment as a matter of law, JNOV, and a new trial in that, while the trial judge has great discretion to determine whether the verdict is contrary to the law or the evidence on a motion for new trial, "[o]n a judgment as a matter of law, [the trial judge] has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue." Id., § 2531, p. 302. These same differences exist between a motion for a JNOV and a new trial under Louisiana law. Martin, 784 So.2d at 632.
The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Joseph, 772 So.2d at 104-05 (citing Anthony v. Davis Lumber, 629 So.2d 329 (La.1993)); Davis, 774 So.2d at 93 (citing Wyatt v. Red Stick Services, Inc., 97-1345 (La.App. 3 Cir. 4/1/98), 711 So.2d 745); see also LA.CODE CIV. PROC. ANN. art.1971, Official Revision Comment (d) (stating, "[a]lthough the trial court has much discretion regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court's ruling aside, or grant a new trial when timely applied for").
Although the standard of review is clear, the application of that standard is not so easy. See Davis, 774 So.2d at 84 (concurring opinion of Justice Lemmon). In Davis, we observed that in reviewing a ruling on a motion for new trial, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." Davis, 774 So.2d at 93-94. Thereafter, we concluded, "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." Id.
*1132 Turning now to the case before us, we find the trial judge's reliance on improper jury instructions, the first articulation in support of his conditional grant of a new trial, was erroneous as a matter of law. It is well accepted a party may not assign as error the giving or the failure to give a jury instruction unless he objected to it at trial. LA. CIV.CODE PROC. ANN. art. 1793(C).[19] As such, we have said that the failure to object to the inclusion of jury charges precludes a party from raising a claim that the trial judge erred by failing to properly charge the jury. Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 583 So.2d 443, 448 (La.1991).
In the present case, the record shows the trial judge gave four particularized instructions on the duty of law enforcement officers: (1) they have exclusive power to regulate traffic; (2) they are duty-bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm; (3) the scope of their duty is to choose a course of action that is reasonable under the circumstances; and (4) the moment a law enforcement officer becomes aware of a dangerous traffic situation, he/she has an affirmative duty to see that motorists are not subjected to an unreasonable risk of harm. At no time did the Davis children object to the inclusion of any of these jury charges or, as a matter of fact, to any others actually given.[20] Accordingly, we find the trial judge erroneously relied upon improper jury instructions as a ground to conditionally grant a new trial.
The second basis the trial judge articulated in support of its decision to grant a new trial was that the jury was either confused or misled by the opinion testimony of George Armbruster, the State Police's expert in the field of law enforcement policies and procedures.[21] Elaborating upon the trial judge's reasons, the appellate court commented that the trial judge "[a]pparently ... assessed the credibility of Sergeant Gros and found his testimony lacking."[22]Davis, 831 So.2d at 1084.
From the outset, we point out the appellate court, not the trial judge, interjected *1133 the issue of Sergeant Gros's credibility. Even with a close reading of the trial judge's reasons for judgment, we are unable to discern any reference by the trial judge that Gros's credibility formed any part of his decision to conditionally grant the Davis children's motion for new trial. Although the Davis children made Sergeant Gros's credibility a significant issue at trial and fully explored that question, that issue was squarely placed before the jury to weigh as it saw fit. Notwithstanding, it is clear that although the jury may have found Sergeant Gros's credibility impeached to the extent of the verbatim transcript of his conversation with Witt, it is nonetheless evident the jury determined that this limited impeachment of Sergeant Gros did not contribute to causation for this accident. Simply stated, although Sergeant Gros's testimony was impeached to a limited extent, this had no bearing on causation for this accident. Accordingly, the jury found no liability on the part of the State Police.
Rather, as shown in his written reasons the lynchpin of the trial judge's conditional grant of a new trial was Armbruster's expert testimony rendered on behalf of the State Police. In this regard, the trial judge opined without elaboration that Armbruster's testimony either misled or confused the jury.
Armbruster testified that the determination of what is reasonable to a law enforcement officer is based on the facts and circumstances known to the officer at the particular time. After examining the police logs and the transcribed telephone conversations in the present case, it was clear to Armbruster the State Police was not presented with an emergency situation. Moreover, Armbruster testified the telephone conversations positively established Witt was fully aware of the traffic regulations applicable to his load of creosote poles and the dangers that those poles presented to motorists at night. Importantly, Armbruster's review of the evidence showed him Witt knew he was not supposed to have his pole-laden trailer on the highway at night.
Armbruster further testified it was important that Sergeant Gros quickly ascertained in the second telephone conversation that Witt had parked his truck in a parking lot and his load did not interfere with traffic on the highway. Armbruster opined that even though Sergeant Gros should have been aware that Witt would need assistance to back up his rig onto the highway, there was no indication that Witt would attempt that maneuver at night. Because it is commonly accepted that the State Police do not provide an escort for oversize loads at night unless an emergency exists, Gros's morning offer of such service was reasonable. Although Witt may have declined an escort, Sergeant Gros provided Witt the opportunity to arrange such morning assistance. Moreover, even if Witt did not accept such assistance at that time, he could have changed his mind and recontacted Sergeant Gros. Additionally, nothing prohibited Witt from relying on help from private persons as long as such assistance was rendered during daylight hours.
In contrast, the jury also heard from Katsaris, the expert employed by the Davis children. Katsaris opined it is the duty of the State Police to give assistance and information to motorists and other citizens, and to investigate vehicles that may be illegally parked or abandoned, or parked under suspicious circumstances. He further opined the State Police must offer help when it is requested. Although he found no error in Sergeant Gros's first communication with Witt to contact the Breaux Bridge Police Department, he found Sergeant Gros improperly terminated his second conversation with Witt without *1134 requiring him to remain parked until a trooper could further investigate the problem. Katsaris reasoned that at that point Sergeant Gros had knowledge that Witt had violated the law already by placing his rig on the road at night and that he may again violate the law by backing out of the meat market parking lot.
When any fair interpretation of the evidence supports the jury's verdict, the grant of a new trial must be reversed. Martin, 784 So.2d at 630; Davis, 774 So.2d at 93. After reviewing the evidence, we find Armbruster's testimony neither confusing nor misleading. Considering the record evidence before us, we find the jury could have fairly determined the State Police acted reasonably and could have properly chosen to accept Armbruster's opinion over that of Katsaris. Even if the trial judge thought the State Police dispatcher had other viable alternatives, it is well accepted an officer's duty to act reasonably under the circumstances does not extend so far as to require that he choose the best or even a better course of action. Mendoza v. Mashburn, 99-499, 99-500 (La.App. 5 Cir. 11/10/99), 747 So.2d 1159, 1164, writ not considered, 00-0040 (La.2/18/00), 754 So.2d 957, writ denied, 00-0037 (La.2/18/00), 754 So.2d 976; Syrie, 693 So.2d at 1173; Mathieu, 646 So.2d at 325. Proof of alternative options is insufficient to prove liability. Syrie, 693 So.2d at 1177.
Moreover, the record is replete with evidence to support the jury's determination that Witt was solely liable for the deaths of Clement and Mary Davis. In light of Witt's many acknowledgments of the danger his load particularly posed at night, it is clear Witt was the sole cause of this accident when he apparently acted impulsively by backing his rig laden with unlighted creosote poles from a safe location away from the motoring public and backed it across a heavily traveled state highway at night. The record shows that within minutes of terminating his conversation with Sergeant Gros, Witt inexplicably disregarded viable alternatives at his disposal, e.g., to remain parked in the meat market lot until morning and be assisted either by a police escort or private persons who could have guided him and warned approaching traffic in daylight hours. See Nichols v. Nichols, 556 So.2d 876, 879 (La.App. 2 Cir.), writ not considered, 561 So.2d 92 (La.1990) (holding the police department was not liable for failure to dispatch an officer to the husband's home; the husband walked into his home knowing his wife was there and she had threatened to kill him).
Having carefully reviewed the record and the applicable jurisprudence, we reverse and set aside the trial judge's order granting a new trial. We find the evidence fully supports the jury verdict in which it exonerated the State Police from liability.

DECREE
For the foregoing reasons, we reverse and set aside the judgment of the lower courts which found Sheriff Charles A. Fuselier, Sheriff of St. Martin Parish, liable and dismiss the plaintiffs' action against him. We further reverse the lower courts' order of a new trial and reinstate the jury's determination that the State of Louisiana, through the Department of Public Safety and Corrections, Office of State Police, was not liable.
REVERSED AND RENDERED.
JOHNSON, J., concurs in part, dissents in part and assigns reasons.
JOHNSON, J. concurs in part, dissents in part.
I concur in the majority's finding that the state is not entitled to a new trial in that the evidence fully supports the jury *1135 verdict in which it exonerated the State police from liability.
However, I dissent from the majority's conclusion that the Sheriff of St. Martin has no liability herein. The record shows that there was sufficient evidence to support the lower courts' findings in this regard. The defendant driver, Charles Witt, entered Breaux Bridge around 8:00 p.m. driving a 1987 Freightliner tractor with a 48 feet trailer hauling 17 creosote poles, 70 feet in length and extending 17 feet beyond the trailer. Realizing the danger of his situation, Witt contacted the sheriff's office seeking assistance on three occasions between 8:17 p.m. and 9:10 p.m. The telephone calls were recorded in the normal course of business. The transcripts of the calls revealed that Witt inquired about his need for an escort in finding a safe place to park until morning and in maneuvering his truck safely through town. The transcripts also revealed that Witt was transferred or referred to the state police and Breaux Bridge police department. He was given poor instructions to a parking lot to be used as a turning location, and was ultimately denied his request for assistance by a deputy sheriff to assess the situation.
In determining liability of the sheriff's office, the trial court utilized the traditional duty-risk analysis. The trial court specifically found that the sheriff's office breached its duty "to protect life and limb and to see that motorists are not subjected to unreasonable risks of harm." Monceaux v. Jennings Rice Drier, 590 So.2d 672 (La.App. 3 Cir.1991); Edwards v. Daugherty, 729 So.2d 1112 (La.App. 3 Cir. 1999) writ denied 747 So.2d 1105; Durvernay v. State of Louisiana, Through Department of Public Safety, 433 So.2d 254 (La.App. 1 Cir. 1993); Nichols v. Nichols, 556 So.2d 876 (La.App. 2 Cir.1990).
The trial court also found that although the circumstances in question did not rise to the level of an emergency, the sheriff's office had enough information to foresee a dangerous traffic situation should Witt move his tractor trailer without assistance. The trial court also found, based on expert testimony, that the sheriff's office acted inappropriately when it failed to send or dispatch a deputy to assess the situation and lend assistance. Thus, the trial court properly found that the sheriff's actions, or inactions, were a cause in fact of the accident. The sheriff owed a duty to the Davises and the Davises were within the scope of protection of the duty owed by the Sheriff to the motoring public.
Finding sufficient evidence in the record to support the trial court's finding of fault as to the sheriff's office, and affirmed by the court of appeal, I must dissent from the majority's reversal of this allocation of fault.
NOTES
[1] LA.REV.STAT. ANN. § 13:5105(A) provides:

No suit against a political subdivision of the state shall be tried by jury. Except upon a demand for jury trial timely filed in accordance with law by the state or a state agency or the plaintiff in a lawsuit against the state or state agency, no suit against the state or a state agency shall be tried by jury.
The Sheriff's Office elected to be tried by a judge only, while the State Police requested a jury trial.
[2] Because of our resolution of this case, we do not reach the question of which standard of review is proper in reviewing conflicting verdicts in a bifurcated trial. In addition, we do not reach the issue of the appellate court's doubling of the damage award because we find neither the State Police nor the Sheriff's Office liable.
[3] See LA.REV.STAT. ANN. § 32:382(2)(A) (providing that vehicles transporting poles and piling or forest products in their natural or treated state shall operate only during daylight hours and shall display a red flag or cloth not less than one foot square at the rear of the load).
[4] The parties stipulated that on May 11, 1997, the official time of sunset was 7:51 p.m.
[5] The record is void of evidence relative to Witt's activities between the hours of 6:30 p.m., when he first exited the interstate before sunset, and 8:17 p.m., the time of his first telephone call, almost 30 minutes after sunset.
[6] A second vehicle was also involved in the accident. Although the occupants of the second vehicle filed suit against many of the same defendants for their injuries, no aspect of that litigation is before us.
[7] Witt received two traffic citations, one for improper backing and another for failure to illuminate a projecting load; he paid both of those fines. Witt was also charged with negligent homicide; he was acquitted of that charge.
[8] The children ranged from eighteen to thirty-five years of age.
[9] Even though the liability of the Sheriff's Office was not before the jury, a verdict interrogatory was propounded to the jury regarding the Sheriff Office's fault pursuant to LA. CODE CIV. PROC. ANN. art. 1812(C)(2)(a)(i)(ii) and LA. CIV.CODE ANN. art. 2323. As this Court held in Lemire v. NOPSI, 458 So.2d 1308 (La. 1984), this does not constitute an allocation of fault to the public body which is exempt from trial by jury and has no bearing on the decision of the trial judge regarding the exempt public body's liability.
[10] It is questionable that the jury should have assessed damages because the only party before it, the State Police, was found free from fault by the jury. Even though LA. CIV.CODE ANN. art. 2323 mandates consideration of the fault of parties not before it, we are aware of no requirement that the jury assess damages to parties/defendants not before it, particularly if the jury has exonerated the party/defendant before it from liability. In the present case, the trial judge tried the Davis children's claim against the Sheriff's Office. Independent of the jury, the trial judge found the Sheriff's Office partially at fault and concurred in the amount of damages the jury found. In explanation of the jury's assessment of quantum, we further note the jury asked the trial judge if it had to reach the question of damages because it found no party before it liable. In response to that question, the trial judge, after consulting with all counsel of record, directed the jury to proceed with the assessment of damages.
[11] The question of the trial judge's independent determination of the liability of the public entity before it has been troublesome and the impact of jury interrogatories relative to public entities has elicited our attention. See, e.g., Beoh v. Watkins, 93-1394, 1395, 1396 (La.App. 4 Cir. 3/29/94), 635 So.2d 424, writ granted, reversed and remanded, 94-1086 (La.6/24/94), 640 So.2d 1325. Commenting on this problem, MARAIST & LEMMON 1 LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE (1999) write:

Just as the judge should be careful not to influence the jury's decision as to the private defendants, the judge should avoid being influenced by the jury as to his or her decision involving the public defendants. Whenever practical, while the jury is deliberating its decision as to the private defendants, the judge should place of record his or her allocation of fault as to the public defendants and the assessment of damages.
Id., § 11.13, n9 at 313.
[12] The issue of harmonizing the jury verdict also formed part of our consideration for granting the writ applications, but because of our disposition of the duty issue we do not reach this problematic issue.
[13] It is important to note that at the time we rendered our order in Thornton v. Moran, 343 So.2d 1065 (La. 1977), the fountainhead for the line of jurisprudence which requires "the court of appeal to resolve the differences between the jury and the judge ... and to render a single opinion," the appellate court had already applied the manifest error standard of review to the contradictory results of the two triers of fact and had determined that neither one was manifestly erroneous. As a result, when we handed down our decision, this threshold determination had already been broached and resolved on the appellate level. Thus, at the point we remanded the case for reconciliation of the verdicts, the appellate court had made the threshold determination that both verdicts were not manifestly erroneous. In the present case that inquiry has not yet been made at this juncture.
[14] We are keenly aware that the various courts of appeal have adopted different procedures to reconcile conflicting decisions of the jury and judge in bifurcated trials. Although we do not reach the question of how to reconcile conflicting decisions, we do comment, as we did once before in Powell, 695 So.2d at 1329, that dicta in Lemire v. New Orleans Pub. Serv., Inc., 458 So.2d 1308 (La. 1984), regarding the use of JNOV to reconcile such inconsistencies is not workable. Our decision in Powell, 695 So.2d at 1329 illustrates that where reasonable minds could differ with respect to the evidence JNOV could not be used as a procedural tool to reconcile conflicting decisions. This is clearly not the function of a JNOV.
[15] For this reason, plaintiffs' reliance on Edwards v. Daugherty, 97-1542 (La.App. 3 Cir. 3/10/99), 729 So.2d 1112, writs denied, 99-1393, 1434 (La.9/17/99), 747 So.2d 1105, is misplaced. This decision relies on Monceaux v. Jennings Rice Drier, 590 So.2d 672 (La.App. 3 Cir.1991), a case which holds that a law enforcement officer has an affirmative duty to not subject the public to an unreasonable risk of harm once he becomes aware of a dangerous traffic situation. In Duvernay, liability was imposed on the Sheriff's Office because it was made aware that a traffic light was malfunctioning. Likewise, in Edwards liability was imposed on law enforcement officers who did nothing to secure an accident scene even though they saw the victim had placed himself in a peculiarly dangerous position. In the present case, Witt was in a safe location when Sergeant Breaux referred him to the State Police.
[16] In making this determination, we find it of no moment that Sergeant Breaux had earlier directed Breaux at night from the highway shoulder near the Food-And-Fun to the Sheriff's office substation. This accident did not occur during the time Witt's rig was on the highway pursuant to Sergeant Breaux's direction.
[17] "The important distinction between a JNOV and a judgment granting a new trial is that a JNOV reverses the jury's award and makes the apparent winner the loser, while a judgment granting a new trial merely erases the jury verdict (or trial court judgment) and puts the parties in the positions they occupied prior to trial." FRANK L. MARAIST AND HARRY T. LEMMON, LOUISIANA CIVIL LAW TREATISE, VOLUME 1, CIVIL PROCEDURE, § 13.4, p. 353 (1999).
[18] In 1991, FED. R. CIV. PROC. RULE 50 was amended to change the terminology from directed verdict and judgment notwithstanding the verdict to "judgment as a matter of law." WRIGHT AND MILLER, Vol. 9A, p. 238, n. 3.
[19] "A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury."
[20] The record shows the Davis children did object to the trial judge's failure to give three tendered instructions. One suggested a law enforcement officer has the duty to implement reasonable measures to protect the public from criminal acts when those acts are reasonably foreseeable. The other two addressed regulations concerning standing or parking vehicles. At no time does the record reflect the Davis children objected to the jury instructions that were given.
[21] The record shows Armbruster was retained as an expert for the Sheriff's Office. During its examination, the State Police elicited his expert opinion with regard to the reasonableness of the State Police's handling of this matter.
[22] Sergeant Gros handwrote an account of his contact with Witt before he was aware the Sheriff's Office recorded all but one of his telephone conversations. Sergeant Gros's handwritten account misstated that: (1) he suggested that Witt contact the Breaux Bridge Police Department when he was ready to leave the meat market parking lot in the morning; (2) Witt told him "never mind" and hung up the telephone when he (Sergeant Gros) offered an escort; and (3) he believed the Sheriff's Office had escorted Witt passed the substation and to the meat market parking lot. The Davis children attacked Sergeant Gros's credibility, using his handwritten account of events and the transcriptions of the recorded telephone conversation.