WINDHORST, J.
Appellants, Larry and Ava Warner, appeal the trial court's February 2, 2016 judgment, rendered in accordance with the jury's verdict, and the trial court's August 8, 2016 judgment denying appellants' motion for new trial and/or judgment notwithstanding the verdict (JNOV). For the reasons that follow, we affirm.
Facts and Procedural History
On July 28, 2011, appellant, Larry Warner, was involved in a motor vehicle accident *1244 in which Mr. Warner's 18-wheeler truck was hit by a vehicle driven by Patrick Alexis[1] and was insured by USAA Casualty Insurance Company (USAA CIC). Mr. Warner filed a petition for damages contending that he sustained injuries as a result of the accident.[2]
During the trial on the merits, appellants' case consisted primarily of the testimony from Mr. Warner and the testimony from his treating physicians. The following testimony and evidence was elicited at trial.
Mr. Warner testified that on July 28, 2011, it was raining when he pulled up to the intersection at Mounes Street and South Clearview Parkway. A vehicle was in front of him when he stopped at the red traffic light. The light changed to green and he proceeded forward when he heard a noise and stopped his truck. He opened the door, attempted to grab the bar to get down, and in his words, "the bar was wet and the steps were wet. I fell out of the truck on my butt." He testified that he was in a hurry to get out when he grabbed the bar and that when he hit the ground, his buttocks went numb. On cross-examination, he acknowledged that his feet slipped off the steps because the steps were wet. He conceded that he previously testified in his deposition that he was not in a hurry, he did not mention grabbing the bar to get out of his truck, and when asked if he was injured when he fell he stated, "Counsel, I would suppose so."
Mr. Warner testified that he is 64 years old and has been driving trucks since 1975. He conceded that he had back pain prior to this accident and received treatment from Dr. James Antinnes with Southern Bone & Joint Specialists, P.A, in Hattiesburg, Mississippi. He first saw Dr. Antinnes in 2009 and 2010 for back pain. Dr. Antinnes ordered an MRI and recommended an epidural steroid injection (ESI), which was performed by Dr. Todd Sitzman. He testified that he did not treat with Dr. Antinnes or have any back pain between 2010 and this accident, and was able to return to work consistently. Mr. Warner further acknowledged that he previously received treatment at the Prentiss Family Medical Clinic (Prentiss) for back pain and was prescribed Lortab prior to his accident. The Prentiss medical records showed that he was diagnosed with sciatica in 2009, continued to receive treatment for it in 2010, and was prescribed additional pain medications. Mr. Warner also testified that he injured his shoulder in a separate accident and received treatment at Jefferson Orthopedic Clinic (Jefferson Orthopedic). He additionally received treatment at Ochsner for a torn ligament in his hand and an MRI for his shoulder from an injury unrelated to this case. He admitted that he was also having problems with his back at that time and was prescribed hydrocodone and tramadol.
Mr. Warner testified that he sought medical treatment approximately a week after the July 28, 2011 accident. He subsequently conceded that he was first sent to see Dr. Barry Bordonaro at Allied Adult and Child Clinic (Allied) by his attorney in *1245 September 2011, six weeks after this accident. Dr. Bordonaro from September 2011 through March 2012, and received "back and heat treatment and shock." An MRI was performed in 2012. Mr. Warner acknowledged that Dr. Bordonaro's medical records did not mention this accident or that he had been involved in any other accidents in which he was injured.[3] He testified that he was discharged from Dr. Bordonaro's care because the treatment did not help his pain and Dr. Bordonaro recommended that he see Dr. Antinnes. On cross-examination, Mr. Warner was confronted with his deposition, and conceded that he had previously stated in his deposition that his treatment with Dr. Bordonaro was helpful.
Mr. Warner next saw Dr. Antinnes. He saw Dr. Antinnes two times in 2012 and told him that his lower back and legs were giving him problems. He did not tell Dr. Antinnes that he had been involved in an accident. Dr. Antinnes ordered an MRI and Mr. Warner received an ESI and hydrocodone. He continued to see Dr. Antinnes through 2014, until Dr. Antinnes recommended surgery. Mr. Warner testified that he was afraid to have surgery at his age, and decided against it. Dr. Antinnes then increased his pain medication. He was last seen by Dr. Antinnes was November 18, 2014.
Mr. Warner stated he next saw Dr. Allen Johnston, at the Louisiana Orthopedic & Spine Institute (Louisiana Orthopedic), for the first time in June or July 2015. Dr. Johnston examined him and performed a procedure in which needles were inserted into his back. Since he received relief from the procedure for six days, Dr. Johnston recommended he have a "burn" procedure performed, which he declined because it was too expensive. Dr. Johnston then prescribed tramadol. On cross-examination, Mr. Warner acknowledged that he told Dr. Johnston that he had a few symptoms from May 2010 through July 2011, and it was raining when he got out of his 18-wheeler, slipped, and landed on his buttocks.
Mr. Warner testified that he decided on his own to stop working in September or October 2011. One of the reasons he could no longer work was because his "back, rear" would start to get numb. He was confronted with his deposition testimony in which he testified that he stopped working in August 2011, and that he had not worked in any capacity since the accident. Mr. Warner conceded that since his accident, he was not declared disabled by any of his doctors and no doctor told him that he should not or could not work. Mr. Warner was also confronted with his medical records dated after this accident, from Louisiana Orthopedic, Jefferson Orthopedic, and St. Elizabeth Physicians (St. Elizabeth) which conflicted with his testimony that he had numbness in his back and that he had stopped working shortly after this accident. His medical records stated that he did not inform his doctors that he had any numbness, he was allowed to drive, he continued to work as a driver after this accident, he did not list prior injuries on his medical forms, and he had no pain in his "spine, ribs, or pelvis."[4] Mr. Warner *1246 additionally admitted that he filed a claim for disability benefits related to an accident that occurred on June 15, 2011, six weeks prior to this accident on July 28, 2011. On the disability form dated April 20, 2012, Mr. Warner stated that on June 15, 2011, he "slipped and fell off top of trailer at work" and injured his "left shoulder and back." Mr. Warner stated that his last day of work was "part-time from June 17, 2011, stopped completely January 6." At trial, when asked if he meant January 6, 2012, Mr. Warner testified he could not say whether "January 6" referred to 2012.
Mr. Warner testified that as a result of his injuries he can no longer drive his personal truck and has lost personal income, which has financially impacted his life. He could no longer drive because he was taking pain medication after this accident which advised against driving or use of heavy equipment while taking the medication. He testified that although he stopped driving between September and October 2011, he continued work in the administrative functions at his business. Since the accident, he hired a mechanic and someone to drive his personal truck. When he drove, he earned 100% of his average weekly wages, which were between $1,800 and $3,000. On a document created by him and his counsel and shown to the jury, his average weekly wages were listed as $1,800 to $2,500. When he hired someone to drive his personal truck, he paid the driver 33% of the gross amount, which left him receiving 67%, for a "30% loss." He testified that for future lost earnings based on the retirement age of 66 years old, he calculated that would lose "250, 300,000" over the next two years based on an average of $2,300 a week. Mr. Warner further testified that his injuries affected other areas of his life.[5] Since the accident, he has not been able to ride horses, drive a four wheeler, or fish. He also has not been able to perform sexually.[6]
*1247 Dr. Johnston[7] testified that he first saw Mr. Warner on June 8, 2015, four years after this accident. Mr. Warner told him that he was previously treating with a doctor that recommended surgery and he was seeking an alternative to surgery. Mr. Warner told him that he had pain in his "low back and right leg" and began having symptoms on July 28, 2011, when he was involved in an accident while working as an 18-wheeler driver. Mr. Warner stated that he got out of his truck while it was raining and "slipped landing on his buttocks." Mr. Warner informed him that a year prior to this incident, he had some pain in his low back and right leg that was treated by a doctor in Mississippi, but his pain resolved in 2010. He stated that he was symptom free for a period of at least 14 to 15 months, maybe longer, prior to this "slip and fall." Mr. Warner stated he received treatment continuously since 2011. Dr. Johnston testified that the "fall" in July 2011 "caused his pain to begin again." He successfully performed a medial block on Mr. Warner, after which 90%-100% of his pain went away. Mr. Warner's last visit was in August 2015, and he recommended that Mr. Warner have an additional procedure, a Radiofrequency Oblation Neurotomy (RFA). He did not restrict Mr. Warner's driving because he was not driving at the time. If he was taking pain medications and narcotics, he would not have let him drive. Dr. Johnston conceded that in his deposition he testified that given Mr. Warner's symptoms, he "would think that he certainly could drive," and recommended short distances would be better, but believed that he could drive. Mr. Warner did not return to see him.
Dr. Johnston's medical records showed that Mr. Warner told him that he had an accident in 2010, which resulted in bulging discs and focal protrusions at L3-4 and L4-5, and that Mr. Warner had a few symptoms regarding his back and right leg pain from May 2010 to July 2011. Dr. Johnston reviewed Mr. Warner's MRIs from 2010 and 2012, but conceded he did not look at the MRIs side by side because that is something a radiologist does, and in this case, Dr. Curtis Partington had reviewed the MRIs side by side. Dr. Johnston further conceded that he described the findings on both the 2010 and 2012 MRIs as "age-related" findings and that the 2014 MRI showed a progression of the pathology previously noted. He agreed that part of his treatment was to account for the new findings in the 2014 MRI. Dr. Johnston acknowledged that Mr. Warner did not state he had any numbness on his intake form. He further acknowledged that when he examined him, Mr. Warner had some right leg complaints, which could have been related to his sciatica. Moreover, he conceded that in his report he stated that it was impossible to say with certainty what percentage of Mr. Warner's pain was "facet versus discogenic." He acknowledged that he could not say whether the pain was from the irritation of the facets versus whatever was occurring with his discs. He further conceded that Mr. Warner's facet joints showed wear and tear.
Dr. Curtis Partington testified via video deposition.[8] He testified that he reviewed Mr. Warner's MRIs and X-rays and issued a report and an addendum. He only looked at the diagnostic studies themselves. The June 2011 and November 2012 MRIs were of Mr. Warner's left shoulder, which are *1248 not alleged as an injury in this case. The January 13, 2012 MRI of his lumbar spine showed arthritis in the lower three levels, with bulging discs, arthritis in the joints in the back part of the spine on the lower three levels, degenerative spine or joint disease. Mr. Partington associated the findings to be consistent with the normal aging process and opined that there was nothing to suggest a superimposed injury on top of the underlying condition or that the condition was caused by the motor vehicle accident. He also reviewed three X-rays of Mr. Warner's lumbar spine. In May 2003, Mr. Warner had arthritis in his lower back, narrowing of the discs, spondylosis, disc bulging, and arthritis in the facets. Dr. Partington testified that this showed Mr. Warner was having issues for a long time at L3-4, L4-5, and L5-S1 (lower three levels). These are the same areas shown on the January 2012 MRI. He opined that Mr. Warner had low back issues and arthritis in his back for at least 8 years prior to this accident. In October 2003, his films showed the same conditions. Dr. Partington said that it was obvious that Mr. Warner had low back pain and radiation down his leg based on the October 2003 films. In March 2010, his films showed the same conditions. When he compared the X-rays to the January 2012 MRI, he saw very little change. Dr. Partington opined that he did not attribute any of the changes in 2012 to a traumatic injury or motor vehicle accident. In his opinion the lumbar pain developed from normal wear and tear from everyday living and was age-related.
Dr. Antinnes[9] testified on behalf of the defendant. Dr. Antinnes testified that he first saw Mr. Warner in 2010, he had a few visits in 2012, and his most recent visits were in 2014. He saw Mr. Warner about every 2 years. In 2010, he reviewed Mr. Warner's MRI which showed a L4-5 bulging disc and degenerative changes (normal age-related changes). He recommended an ESI, which was performed in April 2010. He did not recommend surgery nor did he restrict Mr. Warner's work. On March 6, 2012, two years later, Mr. Warner complained of low back pain. He said the "pain he had two years prior came back." A new MRI was ordered. He compared the two MRIs, which were essentially the same. He recommended another ESI since Mr. Warner had received two years of relief from the prior ESI. Mr. Warner did not mention this accident to him and he was not placed on any work restrictions. Dr. Antinnes testified that Mr. Warner had the same complaints, at the same location, and he received the same treatment. On June 24, 2014, Mr. Warner complained of back pain with radiculopathy down the right leg. He recommended another ESI since Mr. Warner had excellent relief from the ESI in 2012, and it concerned the same areas. He did not recommend surgery for Mr. Warner. On August 26, 2014, Mr. Warner stated that he did not obtain any relief from last ESI and a new MRI was ordered. The MRI of the L4-5 was the same; however, it also showed new findings at the L5-S1, which had more degeneration with arthritis, and a cyst in the facet joint. Dr. Antinnes could not say what happened to cause this change, but stated that the change shown in the new MRI was not the type usually related to an event. Also, the cyst was age-related and not related to an event. He recommended *1249 another ESI at the L4-5 and the L5-S1 and because the cyst had no symptoms and was asymptomatic, he only watched it at that time. On his last visit, November 18, 2014, Mr. Warner stated he was starting to feel better, so he refilled his current medications and prescribed additional medications. Mr. Warner also mentioned this accident for the first time on his last visit. Mr. Warner informed him that his pain began after someone hit him. Mr. Warner stated that he was getting out of the truck when he slipped on the catwalk or running board, and fell to the ground. He did not recommend surgery and Mr. Warner was not placed on any work restrictions. Dr. Antinnes testified that after reviewing Mr. Warner's MRIs, he could not say that this accident caused any of the changes.
Harold Asher was called as a defense expert.[10] Mr. Asher testified that he was asked to calculate Mr. Warner's income prior to and after the accident. According to his tax returns, Mr. Asher stated that Mr. Warner had a loss in 2009 and 2010. He averaged a loss of $1,258 or he was losing about a $1,000 a month after paying all of his business expenses. In 2011, he made a profit operating at some point in a different fashion than he did before the accident. In 2012 and 2013, Mr. Warner hired contract labor and his revenues soared compared to what he was doing beforehand on his own. Due to the change in his business model as a result of the accident, Mr. Warner made a profit of around $1,000 a month, or $12,000 a year with him not driving and having his contractors do the work. His gross revenues increased by $180,000 a year from using contractors. Prior to the accident, he was losing $11,258 per year in cash. After the accident, he was making a profit of $11,484. This was an annual improvement of almost $22,742 or $2,000 a month. Thus, Mr. Asher opined that based on his observations, when Mr. Warner was hurt, he was forced to change his business model. His new business model caused him to not have any losses after the accident, and increased his profits through 2013. Based on his analysis, Mr. Asher opined that Mr. Warner did not sustain an economic loss as a result of his injuries. He further found that Mr. Warner's calculation as to his future wage loss was not supported by his tax returns.
After the testimony and evidence, the jury found that Mr. Alexis was negligent for the accident. However, the jury found that Mr. Warner was not injured on July 28, 2011, and, therefore, did not award damages to Mr. Warner. The verdict of the jury was made the judgment of the court and all the claims brought by appellants against USAA CIC were dismissed with prejudice. Appellants filed a motion for new trial, or alternatively JNOV, which was denied by the trial court. This appeal followed.
Discussion
An appellate court may not set aside a trier of fact's finding in the absence of manifest error or unless it is clearly wrong. Arabie v. CITGO Petroleum, 10-2605 (La. 3/13/12), 89 So.3d 307, 312, citing Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Therefore, in order to reverse a trier of fact's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable *1250 factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Bonin v. Ferrellgas, 03-3024 (La. 07/02/04), 877 So.2d 89, 94-95.
When there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 883 (La. 1993) ; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La. 1990). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations are as reasonable. Rosell, 549 So.2d at 844. Credibility determinations, including evaluating expert witness testimony, are for the trier of fact. Detraz v. Lee, 05-1263 (La. 01/17/07), 950 So.2d 557, 564 ; Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201 (La 10/19/99), 748 So.2d 417, 421. The trial court is in a better position to evaluate live witnesses, as compared with the appellate court's access to a cold record. Guillory v. Lee, 09-0075 (La. 06/26/09), 16 So.3d 1104, 1117. Thus, if the trier of fact's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse. Sistler, 558 So.2d at 1112.
In a personal injury case, the plaintiff bears the burden of proving, by a preponderance of the evidence, a causal relationship between the injury sustained and the accident which caused the injury. Stoll v. Allstate Ins. Co., 11-1006 (La. App. 5 Cir. 05/08/12), 95 So.3d 1089, 1095 ; Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La. 02/20/95), 650 So.2d 757, 759 ; American Motorist Insurance Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La. 1991). A tortfeasor takes his victim as he finds him and when a defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation. Lasha v. Olin Corp., 625 So.2d 1002, 1005-1006 (La. 1993). A plaintiff must prove causation by a preponderance of the evidence. Morris v. Orleans Parish School Bd., 553 So.2d 427, 430 (La. 1989). The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Mart v. Hill, 505 So.2d 1120, 1128 (La. 1987). Whether an accident caused a person's injuries is a question of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973, 979 (La. 1991) ; See also, Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La. 1991) ; Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815, 822 (La. 1988).
Judgment notwithstanding the verdict (JNOV) is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. Lastrapes v. Progressive Sec. Ins. Co., 10-0051 (La. 11/30/10), 51 So.3d 659, 662, citing Joseph v. Broussard Rice Mill, Inc., 00-0628 (La. 10/30/00), 772 So.2d 94, 99. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of *1251 impartial judgment might reach difference conclusions. Joseph, 772 So.2d at 99. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Public Service, 583 So.2d 829 (La. 1991).
The granting or denying of a motion for new trial is within the discretion of the trial court. Davis v. Witt, 02-3102, 02-3110 (La. 07/02/03), 851 So.2d 1119, 1130. In Davis, the court explained:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. Id., citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La. App. 2 Cir. 1991).
In a motion for new trial, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. Joseph, 772 So.2d at 104. The applicable standard of review is whether the trial court abused its discretion. Id.
In their first and third assignments of error,[11] appellants contend that the trial court erred in (a) its denial of their motion for new trial and/or alternatively JNOV pursuant to La. C.C.P art. 1971 and La. C.C.P. art. 1811, and (b) its "application/finding" that appellant did not suffer an injury based on the undisputed testimony and evidence presented by the parties.
Appellants contend that the jury's finding that he was not injured on July 28, 2011 was contrary to the law considering the "uncontroverted testimony, evidence, argument of both counsel presented at trial and certain findings of the jury, and is a clear indication that the jury was confused by the jury verdict form and/or did not understand the application of the duty risk analysis necessary to properly deliberate the merits of this matter." Appellants also argue that the failure to award damages was contrary to the testimony and evidence. Appellants contend that while the parties disputed the extent of the injuries, the pre-existing nature/causation of some of the injuries, and/or the duration of Mr. Warner's injuries, whether Mr. Warner was injured was undisputed, and was admitted to by the appellee, appellee's experts, and appellants. Appellants argue that reasonable minds could not differ in reaching the conclusion that Mr. Warner was injured as a result of the accident, and but for the "woefully inadequate, confusing and insufficient jury instructions" and "verdict form," specifically question number 2, reasonable minds would have concluded Mr. Warner was injured as a result of the accident.
Based on our review of the record, we disagree. The jury's determination that *1252 Mr. Warner did not sustain any injuries as a result of the accident is entitled to great deference on appeal, and in this case, it is well supported by a reasonable factual basis in the record. We find that the jury was not manifestly erroneous in finding Mr. Warner's injuries were not causally connected to this accident. Accordingly, we further find that the trial court did not err in denying appellants' motions.
The jury heard inconsistent testimony from Mr. Warner regarding (1) his prior low back and right leg pain, (2) whether the prior pain resolved prior to this accident, (3) the alleged injuries sustained in this accident, (4) injuries sustained a result of unrelated accidents prior to and after this accident, (5) his treatment for this alleged injury and treatment for unrelated injuries, (6) whether he informed all of his treating physicians about this July 28, 2011 accident in connection to his various treatment, (7) whether he was seeking disability for his back after this accident in regards to an unrelated accident, (8) information concerning future medical treatment and (9) no loss of personal income. The testimony and evidence clearly shows that the jury obviously doubted the credibility of Mr. Warner. Furthermore, the testimony and evidence from Dr. Antinnes, Dr. Partington, and Mr. Warner's medical records, apparently carried more weight with the jury than the testimony of Dr. Johnston, which played a role in the jury's determination that Mr. Warner's alleged injuries were not causally related to this accident. Assignments of error one and three are therefore without merit.
In their second assignment of error, appellants contend that the trial court erred in its selection of jury instructions and jury interrogatories/verdict form. Appellants argue the jury instructions and jury interrogatories/verdict form were woefully incomplete and insufficient. Thus, appellants are entitled to de novo review, or alternatively, a remand for new trial. Appellants claim that they timely objected to the inadequacy of both the jury instructions and interrogatories/verdict form to no avail. They contend that the trial court failed to properly explain to the jury the duty risk analysis and its application to this case and also failed to establish that the jury understood the burden of proof, the weighing of evidence, credibility determinations, the role of expert testimony and treating physician testimony. Appellants argue that the trial court deliberately changed or adjusted the jury charges and verdict form such that it was prejudicial to appellants and confused the jury.
La. C.C.P. art. 1792 B requires the trial court to instruct the jury on the law applicable to the cause submitted to them. Wooley v. Lucksinger, 09-571, 09-584, 09-585, 09-586 (La. 04/01/11), 61 So.3d 507, 573. In determining whether the trial court adequately instructed the jury, the Louisiana Supreme Court defined adequate jury instructions in Wooley, 61 So.3d at 574, as follows:
Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error. (Citations omitted.)
La. C.C.P. art. 1793 C provides that "A party may not assign as error the *1253 giving or failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds for his objection." In order to preserve the right to appeal a trial court's failure to give a requested instruction or its giving of an erroneous instruction, a party must make a timely objection and state the grounds for that objection. Willis v. Ochsner Clinic Found., 13-627 (La. App. 5 Cir. 04/23/14), 140 So.3d 338, 348-349. This rule also applies to jury interrogatories. Id. at 349 ; Hebert v. Old Republic Ins. Co., 01-355 (La. App. 5 Cir. 01/29/02), 807 So.2d 1114, 1127. Moreover, objections must be specific to allow the trial court a fair opportunity to correct any error before jury deliberations. Fields v. Walpole Tire Serv., L.L.C., 45,206 (La. App. 2 Cir. 05/19/10), 37 So.3d 549, 560. It is only when jury instructions or interrogatories contain a "plain and fundamental" error that the contemporaneous objection requirement is relaxed and appellate review is not prohibited. Berg v. Zummo, 00-1699 (La. 04/25/01), 786 So.2d 708, 716, n.5.
The record establishes that the first time the trial court asked the parties if they had any objections to the jury instructions, appellants' counsel stated they did not have any objections. Appellee then stated its respective objections. After the trial court started changing some of the jury instructions based on appellee's objections, appellants' counsel objected to the trial court taking items out of the jury instructions.[12] The trial court noted appellants' objection regarding jury instructions removed. However, in this appeal, appellants' did not specifically and clearly state what jury instructions they objected to and how the trial court erred in removing or changing the jury instructions.[13] Moreover, the record establishes that the issues argued in this appeal regarding the jury instructions were not argued as grounds for objection at trial and thus, are not preserved for review on appeal. Accordingly, they are not reviewable by this Court.
The record further shows that appellants' counsel objected to a few of the items listed on the updated jury verdict form. At appellants' request, the trial court swapped number 1 and 2 on the verdict form, agreed to the amendment in number 3, and separated out the "past" and "future" columns for wages and the same for loss of enjoyment of life in number 8. The only objection not specifically addressed by the trial court was with regard to appellants' objection to the inclusion of number 4. After the trial court changed, moved, or otherwise kept items in the verdict form, appellants' counsel did not object to the final version of the verdict *1254 form, which included number 4.[14] On appeal, appellants' counsel contends that because the jury found that Mr. Warner was not "injured on July 28, 2011," the jury verdict form was "woefully inadequate, incomplete and insufficient." However, the appellants failed to properly object to the final verdict form and state specifically how the verdict form was inadequate, incomplete, or insufficient. Moreover, despite placing the contents of the verdict form in their brief, appellants again failed to state the specific grounds for their objection to the verdict form. An adverse judgment is not a ground for an objection to the verdict form. Accordingly, appellants did not preserve this issue for appeal.
In their fourth assignment of error, appellants contend the trial court erred in limiting counsel during voir dire and erred in "forcing/limiting counsel and the jury into closing and deliberations under penalty of counsel having to pay to keep the courthouse open and the court having a problem with same." Appellants argue that this limitation denied them their constitutional right to a full and fair voir dire examination, which ultimately prejudiced appellant's ability to examine and ascertain whether or not the prospective jurors had the ability and understanding to adequately analyze and understand how to apply the applicable law to the facts of the case. Appellants also contend that prior to the start of voir dire , the trial court excluded a potential prospective juror based on the court's past personal prejudice to the potential juror without giving appellants the opportunity to conduct voir dire on said juror to determine if the juror was capable of rendering an impartial verdict according to law.
La. C.C.P. art. 1763 allows the parties or their attorneys to individually examine prospective jurors as each party deems necessary, but the trial court may control the scope of the examination conducted by the parties or their attorneys. The purpose of voir dire is to develop the prospective juror's state of mind, not only to enable the trial court to determine actual bias, but to enable counsel to exercise his intuitive judgment concerning the prospective jurors' possible bias or prejudice. Schouest v. Burr, 09-356 (La. App. 5 Cir. 01/12/10), 30 So.3d 1017, 1019. The trial court is vested with broad discretion in regulating and supervising voir dire and in ruling on challenges. Riddle v. Bickford, 00-2408 (La. 05/15/01), 785 So.2d 795, 801. The trial judge's rulings governing the selection of a civil jury will be reversed only when a review of the entire voir dire reveals that the trial court abused its broad discretion. Id. The trial court has broad discretion as to the scope and extent of voir dire . Id.
A review of the record establishes that appellants were not denied a full and fair voir dire . Moreover, appellants fail to specifically state how and in what manner the trial court precluded them a full and fair voir dire . In fact, the record shows that the trial court afforded appellants' counsel an extensive voir dire examination of both jury panels with only minimal interruption from the trial court to explain the process and purpose of voir dire to both counsel.[15]
As to the trial court's removal of a potential juror, the record shows that *1255 prior to the prospective jurors entering the courtroom, the trial judge revealed to both counsel at the bench that one of the jurors should be removed from the jury because she represented the juror's ex-husband in a contentious domestic matter. The trial judge stated that the prospective juror did not "even need to come in the courtroom." Neither counsel objected to the removal of this prospective juror. Once the juror was removed, the remaining jurors entered the courtroom wherein they were sworn in prior to examination. We do not find that the trial court abused its discretion in dismissing a prospective juror prior to the jurors entering the courtroom and prior to the jurors being sworn. La. C.C.P. art. 1761 ; La. C.C.P. art. 1762.
Regarding appellants' contention that the trial court erred in "forcing/limiting counsel and the jury into closing and deliberations under penalty of counsel having to pay to keep the courthouse open and the court having a problem with same," we find this argument is without merit. Appellants did not specifically brief or state how the trial court limited their closing argument or forced early deliberations. Moreover, the record does not support this argument.[16]
*1256 Conclusion
For the reasons stated above, we affirm the February 2, 2016 and August 8, 2016 judgments.
AFFIRMED

Prior to the start of trial, USAA CIC moved to dismiss its insured, Mr. Alexis, who was named as a defendant but was not served. The trial court dismissed Mr. Alexis, and the case proceeded against USAA CIC as the insurer under the Direct Action Statute, R.S. 22:1269 B(1)(a)(c).

Appellant, Mrs. Warner, also had a claim for loss of consortium, support, love, and affection.

The form stated that Mr. Warner was "at stop sign but pulled over check 18-wheeler. Got out of truck and slipped on wet pavement." On the form, Mr. Warner was asked if he had ever been involved in any other accidents in which he was injured and he checked the "No" box and under the section that states "describe" he wrote "none."

The intake form, dated October 12, 2012, stated that Mr. Warner was not currently having problems with "neurological numbness, tingling, balance," and his occupation was listed as "driver." St. Elizabeth's medical records, dated February 12, 2012, stated that Mr. Warner was occasionally working, he had no numbness, and he did not list a history of any injuries. St. Elizabeth's records, dated May 14, 2013, stated he had a shoulder complaint and was prescribed Lortab. St. Elizabeth's records, dated March 22, 2013, stated he was prescribed more pain medication and he had no pain after a spine, rib, pelvis inspection. Dr. Johnston's medical records showed that Mr. Warner underlined "No" in answer to whether he had "numbness, tingling, pins and needles or falling asleep in your legs." Jefferson Orthopedic medical records, dated February 1, 2013, provided "patient may drive." Another medical record provided that Mr. Warner was seen for a work-related injury with symptoms beginning on October 9, 2012, 15 months after this accident. Another medical record, dated October 26, 2012, provided that Mr. Warner sustained a fall at work.

Ava Warner testified that she has been married to Mr. Warner for 40 years and they have three children. From her perspective the accident affected her husband emotionally, physically and financially. Prior to the accident, Mr. Warner was independent and always on the go. Since the accident, he gets upset easily, frustrated, and is not able to perform everyday activities, such as cutting the grass, fixing things around the house, taking out the trash, riding horses, dancing, or going on walks. Prior to the accident, he only took medication for his ulcers and now he takes several different pain medications. Because he is always medicated, Mr. Warner can no longer work, which impacts the family financially. Additionally, they used to be intimate all the time, "four times a week or more," and now they are no longer intimate.

He testified that prior to the accident he used to have sex on the weekends because he worked during the week. After the accident, he did not have "inspiration" to perform due to the medications he was prescribed.

Dr. Johnston was qualified as an expert in the field of orthopedics.

Dr. Partington was qualified as an expert in general diagnostic radiology and neuro radiology.

Dr. Antinnes is licensed to practice in Mississippi and qualified as an expert in orthopedic spine surgery.

He was qualified as an expert in the field of CPA, forensic CPA, and in calculating economic loss and projections.

The parties did not appeal the finding of the jury that Mr. Alexis was at fault for the July 28, 2011 accident, and that USAA CIC was Mr. Alexis' insurer at the time of the accident. Thus, a determination of fault is not considered in this appeal.

We find the charges read as a whole sufficiently informed the jurors of the correct law.

Although it is difficult to determine from the transcript, appellant appears to have objected in part to the removal of instructions concerning intersectional cases, the addition of the requirement of proving residual disability for future wages even though it was a correct statement of law, and the trial court's refusal to change "gross income" to "personal income" in the wage instructions, even though appellant did not have any law to support their position. On appeal, appellants' contend the jury instructions were incorrect regarding the duty risk analysis and its application to this case and that the trial court also failed to establish that the jury understood the burden of proof, the weighing of evidence, credibility determinations, the role of expert testimony and treating physician testimony. Appellants did not object to the jury instructions regarding the issues presented in this appeal.

However, the jury found that Mr. Warner was not injured on question number 2 and then signed the form. Therefore, the jury did not get to question number 4.

For example, at one point during appellants' voir dire of the first panel, the trial court called both counsel to the bench, out of the hearing of the jurors, and stated the following:
I've let it go on and on and on but we are not pre-trying this case to the jury. As I just said, we're testing issues of law and whether or not the juries [sic] can follow the law. We're not talking about Mr. Warner's case, not in a voir dire . You are pre-trying this case to each individual juror and I'm not going to-and you haven't objected but I'm sitting here and we're not going to talk about Mr. Warner or Mr. Warner's case. We're going to talk about theories of law and whether or not this jury is biased, will follow the law, et cetera, et cetera. But we're not going to go into Mr. Warner's case specifically.
Does everybody understand? It's going to apply to you, too.
Both counsel responded that they understood and appellants' counsel did not object to this admonishment from the trial court regarding the purpose of voir dire . The trial court's admonishment in no way limited appellants' counsel from continuing her voir dire . Appellants' counsel continued voir dire and shortly thereafter, the trial court called the parties to the bench again. The following conversation occurred:
Mr. Nieset: Now we're pre-trying the wage part.
The Court: No, She's [Ms. Benoit] giving a hypothetical and she's allowed to test that. She's allowed to test that. She's not allowed to test whether or not they can apply the law. But you've been voir diring for an hour and a half.
Ms. Benoit: Okay
The Court: We need to get this moving.
Ms. Benoit: I'm wrapping up.
Whereupon, Ms. Benoit, appellants' counsel continued with her voir dire of the first panel without any limitation by the trial court. During examination of the second panel, the trial court did not say or limit appellants' voir dire examination in any way.

The following conversation occurred between the trial court and counsel:
The Court: How long do you think closing will be?
Mr. Nieset: I'd say 10 minutes, 15.
Ms. Benoit: I can't say, Judge. I would probably say 20, 25 minutes, our Honor.
The Court: Okay. It is 4:54. If the jury is not deliberating by 7:00 o-clock, the attorneys will be charged $650 to $750 an hour.
Ms. Benoit: Do you mean completely finished or having not started?
The Court: At 7:00 o'clock, they need to be in the back deliberating; otherwise, I'm ordered to send them home and come back, unless you pay to keep the building open.
Mr. Nieset: That's two hours.
The Court: That's two hours. I've sat in this case for three days now, so that's why I asked. If anybody thinks that they're going to give closing arguments for an hour and a half, then we're going to have a problem. Bring in the jury.
Based on a clear reading and understanding of the conversation between the trial court and counsel, the trial court did not limit either counsel's argument nor did the trial court force closing or deliberations under penalty of paying to keep the courthouse open. The trial court apprised the parties of the rules for keeping the courthouse open past 7:00 P.M. The parties did not object to this information.