869 So.2d 71 (2004)
Gabriel OUBRE
v.
Azmi ESLAIH, Reassurance of New York, Nighthawk Cab Company, Marc Williams and Allstate Insurance Company
Melanie Eslaih, Wife of/and Azmi Eslaih
v.
Marc D. Williams, Allstate Insurance Company, and Louisiana Department of Transportation and Development
Martin Mongrue
v.
Azmi Eslaih, Reassurance of New York, Nighthawk Cab Company, Marc Williams and Allstate Insurance Company.
No. 2003-C-1133.
Supreme Court of Louisiana.
February 6, 2004.
Rehearing Denied April 23, 2004.
*73 Sherry S. Landry, City Attorney, Albert A. Thibodeaux, Deputy City Attorney, Frank B. Hayne, III, for applicant.
Charles R. Ward, Jr., Gretna, Stephen B. Murray, New Orleans, for respondent.
VICTORY, J.
We granted the City of New Orleans' writ application to determine whether the trial court's finding of liability on the part of the New Orleans Police Department ("NOPD") in this case was manifestly erroneous. After reviewing the facts and the applicable law, we find that the plaintiff failed to present evidence that the NOPD was aware of a dangerous traffic situation which would have given rise to an affirmative duty to see that motorists were not subjected to unreasonable risks of harm. Thus, we reverse the judgments of the lower courts.

FACTS AND PROCEDURAL HISTORY
At around midnight on November 3, 1995, the plaintiff, Azmi Eslaih ("Eslaih"), was traveling westbound on I-10 approaching the Westbank Expressway/South Claiborne Avenue exit, when the taxi cab he was driving stalled over the elevated portion of the interstate. At this point of the interstate, the Westbank Expressway/South Claiborne Avenue exit goes off to the left and the I-10 veers to the right continuing towards Baton Rouge. Eslaih's cab initially stalled at the point where the two roads split and the rear of his car was in the lane of traffic going towards Baton Rouge. He then pushed his car across several lanes of traffic to the emergency lane on the left-hand side of the Westbank Expressway/South Claiborne exit. The weather conditions were rainy and the road was wet. Eslaih managed to position his car entirely in the emergency lane but facing east-bound, towards the oncoming traffic. He put on his flashing lights and attempted to restart his engine with no success. After approximately 45 minutes, he flagged down another cab driver who drove Eslaih home to Metairie. While at home, Eslaih ate a snack and called AAA to request a tow truck. AAA reported that they would be there in one hour. Eslaih then drove his wife's van back to the scene to wait for the tow truck and to retrieve some items out of his cab. He arrived at approximately 2:00 a.m. and parked his van in the emergency lane three feet in front of his cab, so that the trunk of the cab was facing the back of his van. He then stood between the two vehicles and began loading things from his cab into his van. At approximately 3:00 a.m., an automobile driven by Marc Williams, proceeding west on I-10, struck the stalled taxicab, pinning Eslaih between it and the van. As a result of the accident, Eslaih suffered severe injuries.
Eslaih sued Williams, Allstate Insurance, and the State of Louisiana, DOTD. Four years later, after his new attorney noticed prior deposition testimony wherein Eslaih stated he saw a NOPD cruiser pass the scene without rendering assistance, he added AAA and the City of New Orleans as additional defendants. AAA was dismissed on summary judgment, the State was voluntarily dismissed, and Eslaih settled with Williams and Allstate, leaving the City as the only defendant at trial. Eslaih alleged that the City was liable for his accident because, while at the scene of the accident, he saw two NOPD cruisers drive past the scene without rendering assistance.
*74 At trial, Eslaih testified about seeing two police cruisers passing his broken down cab in the emergency lane as follows:
Q. What did you do as you as you were waiting there?
A. First I start trying to look at my car and see if I can start it, try many times until the battery went down when I kept trying. So after that, I just, you know, sit on the side of the road and wait.
Q. Did you see any vehicles pass by at the time?
A. Yeah. Vehicle was passing by.
Q. There was traffic on the road; is that right?
A. That was traffic.
Q. Did you see any law enforcement vehicles pass you by?
A. Yeah, saw police car.
Q. Could you tell us what kind of police car that you saw pass by?
A. New Orleans police.
Q. NOPD marked cruiser, is that correct?
A. Yeah.
Q. And are you familiar with the NOPD marked cruisers?
A. Yeah, been driving a cab in the New Orleans and in the French Quarter all the time. I see them all over.
Q. So you're able to distinguish the NOPD cruisers from other law enforcement vehicles; is that correct?
A. Yes.
Q. Did that cruiser stop?
A. No.
Q. What wasWhat were the weather conditions at the time?
A. It was raining.
Q. And your flashers were still on?
A. The flashers were still on.
He also testified that he saw another NOPD cruiser pass after he returned to the scene with his wife's van:
Q. As I understand what you're telling us, the reason that you placed your wife's van where it was is so that you could unload your personal things from your cab to your wife's van?
A. Yes, sir.
Q. While waiting and while doing this, did you notice law enforcement vehicles pass at that time?
A. Yeah.
Q. What type of law enforcement vehicle did you notice pass the second time you were out there?
A. New Orleans.
Q. New Orleans Police Department cruiser?
A. New Orleans Police.
Q. Was it a marked vehicle?
A. Yes, sir.
Q. Did it stop?
A. No.
Q. What were the weather conditions at that time?
A. Still the same thing. It was, like, drizzling, wet.
Q. The ground was wet?
A. Start rain and stop rain continuously.
Q. Did you put the flashers on for your wife's van?
A. Yes, sir.
Q. So both vehicles that were on the side of the road had their emergency flashers on; is that correct?
A. Yes, sir.
Q. Were both vehicles out of the lane of through traffic?
A. Yes, sir.
On cross-examination, he further testified:

*75 Q. I believe you told us that during that first hour, you saw one police car go by?
A. Yes, sir.
Q. Could you see inside the police car?
A. Inside?
Q. Uh-hum.
A. No, not can see inside. It's dark.
Q. Do you know where the police car was going?
A. It was going, driving the highway on I-10. I don't know where.
Q. You don't know what its mission was?
A. No.
Q. And theYou saw a second police car after you came back; is that correct?
A. Yes, sir.
Q. Could you see inside that car?
A. No.
Q. Do you know what type of mission it was on?
A. No.
Q. Did you signal either car?
A. No, `cause, you know, when I see it's a police car, it was by my side cannotwas night, 3 o'clock in the morning, dark. So I'm looking at every car, `cause I'm lookingI know it's a police car or another cab driver is the one who stop for me. So I'm looking at every car.
Q. Why didn't you call the Police Department and report your broken-down car?
A. `Cause I went home. I called AAA and asked them to tow my car, and I thought this is the end of the problem.
He further testified on cross that both vehicles were in the emergency lane and neither was blocking traffic. On redirect, he testified that neither of the police cars had their emergency lights or sirens on.
New Orleans Police Officer James Seaberry, Jr., who investigated the accident that night, testified that as a First District Officer, he never has occasion to travel on the raised portion of the interstate where the accident occurred because the First District is small enough so that interstate travel is not necessary to get around the district and the crime areas that need patrolling are located below on the streets, not the interstate. He further testified that a car parked the wrong way on an emergency lane on the interstate late at night with a pedestrian outside creates a potentially hazardous situation and any prudent officer would have stopped if they had observed such a circumstance. He further stated that a prudent officer would have placed his car behind the vehicle and turned his overhead lights on to secure that area so he could be visible to oncoming traffic.
Sergeant Orwin J. Walters, Jr., whose duties with the New Orleans Police Department included formulating and writing rules and regulations for the NOPD, testified that the NOPD had the responsibility, relative to other state agencies, for patrolling the portion of the interstate where the accident occurred, that although no written policy existed in this regard in 1995, any prudent officer would have stopped had he observed a motorist stranded on the side of the road which creates a hazardous situation, unless he had been dispatched on an emergency mission.
The trial court found liability on the part of the City based on the plaintiff's testimony that he saw two NOPD cruisers pass the scene without offering assistance, as follows:
The evidence presented at trial established that the taxicab was stranded on the shoulder of I-10, in rainy conditions and facing oncoming traffic from midnight until 3:00 a.m. During this time *76 Mr. Eslaih testified that two New Orleans Police Department (NOPD) cruisers drove pass him and his stranded taxicab without stopping to offer assistance. No evidence was presented at trial to suggest that the cruisers were responding to an emergency. This Court finds it troublesome that the NOPD cruisers would fail to recognize the potential hazard created by the vehicles on the shoulder of I-10 especially given the inclement weather conditions. This Court's opinion is that at the very least the cruisers should have reported the hazardous condition via radio, anything less than that was clearly negligent.
According to Louisiana law, when a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that the public is not subjected to unreasonable risk of harm. Furthermore, the City's witness at trial, Sergeant Orman Walters of the NOPD set forth the customary duty and responsibility owed by the NOPD to stop and render assistance to stranded motorists. Sergeant Orman testified that there was no written rule or regulation in place within the department, but proper policy for a New Orleans police officer would be to stop and render assistance to a stranded motorist.
The NOPD neglected to offer any assistance to Mr. Esliah. The accident that resulted from the hazard of the vehicles being on the side of the road caused Mr. Esliah to suffer severe injuries.
The trial court found the City of New Orleans liable for 30% of Eslaih's damages: $250,000.00 in general damages; $70,768.33 in medical special damages; and $36,000.00 in past lost wages. The trial court judgment further held that "all other defendants be held liable for the remaining 70% fault." The court of appeal affirmed, but amended the judgment to make the City 50% liable as a solidary obligor. Oubre v. Eslaih, Reassurance of New York, Nighthawk Cab Company, Marc Williams and Allstate Insurance Co., 02-1386, c/w Eslaih v. Marc. D. Williams, Allstate Insurance Company and Louisiana Department of Transportation and Development, 02-1387, c/w Martin Mongrue v. Azmi Eslaih, Reassurance of New York, Nighthawk Cab Company, Marc Williams and Allstate Insurance Company. 02-1388 (La.App. 4 Cir. 2/26/03), 840 So.2d 54. We granted the City's writ application. Oubre v. Eslaih, Reassurance of New York, Nighthawk Cab Company, Marc Williams and Allstate Insurance Co., c/w Eslaih v. Marc. D. Williams, Allstate Insurance Company and Louisiana Department of Transportation and Development, c/w Martin Mongrue v. Azmi Eslaih, Reassurance of New York, Nighthawk Cab Company, Marc Williams and Allstate Insurance Company, 03-1133 (La.6/27/03), 847 So.2d 1281.

DISCUSSION
An appellate court should not set aside the factual findings of a trial court absent manifest error or unless clearly wrong. Arceneaux v. Dominigue, 365 So.2d 1330 (La.1978). However, if a court finds that the trial court committed a reversible error of law or manifest error of fact, the court of appeal must ascertain the facts de novo from the record and render a judgment on the merits. LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766. Although appellate courts should accord deference to the fact-finder, they nonetheless have a constitutional duty to review facts. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. Because appellate courts must perform this constitutional function, they have every right to determine whether the trial court verdict *77 was clearly wrong based on the evidence or clearly without evidentiary support. Id. The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880, 882 (La.4/12/93).
Whether liability exists under the facts of this particular case is determined by conducting a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty. Berry v. State Through Dept. of Health and Human Resources, 93-2748 (La.5/23/94), 637 So.2d 412, 414. Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 638 So.2d 1075.
The duty of a police officer relative to the facts of this case is as follows. The legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers are duty-bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Davis v. Witt, 02-3102 (La.7/2/03), 851 So.2d 1119, 1127; Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173; Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La.App. 3 Cir.1991). Thus, the first issue to be determined in this case is whether or not a New Orleans police officer became aware of a dangerous traffic situation.
The plaintiff testified that he saw two New Orleans police cruisers pass the scene, once while his cab was parked in the emergency lane, and once when his cab and his van were parked in the emergency lane. However, the plaintiff must do more than simply prove that he saw a police officer pass by. He must prove that in passing by, the police officers became aware of a dangerous traffic situation that presented an unreasonable risk of harm. As we stated in Davis, "our courts have not imposed a heightened duty on police officers unless the officer has actual knowledge that a dangerous traffic situation exists." Davis, supra at 1128 (cites omitted). "Secondly, absent special knowledge of driver disability or impairment, we do not require police officers to anticipate the driving proclivities of people on the highway." Id. (Cites omitted.) As we noted in Davis, it is for these reasons that cases which have upheld liability on the part of a police department are distinguishable. Id. at 1128, n. 15. In Edwards v. Daugherty, wherein liability was imposed on law enforcement officers, five witnesses testified that two sheriff's deputies drove through the accident scene without rendering assistance after clearly seeing and waving at the people at the accident scene. 97-1542 (La.App. 3 Cir. 3/10/99), 729 So.2d 1112, 1128, writ denied, 99-1393, 99-1434 (La.9/7/99), 747 So.2d 1105. Also, in that case, the vehicles involved in the accident were partially in the two-lane roadway, with neighbors using strobe lights to direct traffic around the accident scene, and the officers saw that the victim had placed himself in a peculiarly dangerous situation. Similarly, in Duvernay v. State, through *78 Dept. of Public Safety, liability was imposed on the Sheriff's Office because it was made aware that a traffic light was malfunctioning. 433 So.2d 254 (La.App. 1 Cir.), writ denied, 440 So.2d 150 (La.1983).
In this case, we find that the plaintiff did not meet his burden of proof that in driving down I-10, the officers became aware of a dangerous traffic situation that presented an unreasonable risk of harm. The evidence was clear that plaintiff's cab was parked entirely in the emergency lane of traffic not protruding at all in the travel lane of the highway. Further, there was no proof that the officers in the cruisers were looking that way as they drove by, or that he could sufficiently see Eslaih's cab in the emergency lane of the Westbank Expressway/Claiborne Avenue exit to the extent necessary to determine whether a dangerous traffic situation existed. The plaintiff testified that after he tried to start his car a few times, "the battery went down," and he just sat on the side of the road and waited. In order for plaintiff to get a cab to stop for him, he had to actually flag down the cab. There was no evidence that a passing police car would have been able to tell that a person was in or near the car at the time, given the late hour, and the rainy conditions. We note that although plaintiff testified his flashers were activated, he also testified he had previously drained his battery attempting to restart his vehicle. The record does not establish whether the flashers were fully illuminated. After plaintiff returned with the van and parked it entirely in the emergency lane with the headlights on, even if a police officer had noticed the situation, he or she could have correctly assumed that a motorist was no longer stranded and already had assistance. Although police officers testified that a car parked in an emergency lane facing the wrong direction on a rainy night with a stranded motorist may present a potentially hazardous situation such that a prudent police officer would stop and render assistance, there was no evidence an officer observed such a situation.[1]

CONCLUSION
The law in our state is clear that an officer has an affirmative duty to protect life and limb and see that motorists and pedestrians are not subjected to unreasonable risks of harm, from the moment a law enforcement officer becomes aware of a dangerous traffic situation. Syrie, supra at 1173. A plaintiff must do much more than testify that he saw police cars pass him by in order to prove liability against the City. An entity would have no way to defend itself against such an assertion. At a minimum, a plaintiff must prove that the police officers, as they passed, became aware of a dangerous traffic situation which presented an unreasonable risk of harm to motorists, and failed to act. Plaintiff failed to meet that burden in this case. Thus, we find that the trial court judgment imposing liability on the City based solely on Eslaih's assertion that he saw two NOPD cruisers pass the scene of his stalled vehicle without rendering assistance to be manifestly erroneous.

DECREE
For the reasons stated herein, the judgments of the trial court and court of appeal *79 are reversed, and suit against the City of New Orleans is dismissed with prejudice.
REVERSED.
KIMBALL, J., dissents and assigns reasons.
KIMBALL, J., dissenting.
I respectfully dissent. In this case, the plaintiff testified that while awaiting the arrival of a tow truck in the emergency lane on the westbound I-10 with his vehicle's indicator lights on, he observed two NOPD cruisers drive past him without stopping to render assistance. The trial court, as the finder of fact, had the opportunity to observe the credibility of the plaintiff, review the evidence, including photographs of the scene and location of plaintiff's vehicle, and rendered judgment in his favor. Such a determination that the police vehicles in question could not have passed plaintiff's vehicle without observing him is reasonable on the record and should not be overturned absent manifest error.
The majority's decision charges plaintiff with too onerous a burden. Under the majority's analysis, a plaintiff would have to record the license number of the police vehicles and provide independent witnesses who could testify that the police officer(s) observed plaintiff in an emergency situation and failed to render assistance. Thus, the majority seeks to raise plaintiff's burden from a preponderance of the evidence to that of clear and convincing which is clearly inappropriate under our law.
For these reasons, I respectfully dissent.
NOTES
[1] Indeed, the plaintiff did not think that the placement of his cab in the emergency lane posed a dangerous traffic situation, as he never made any attempt to flag down a police car and he did not even call the police when he got home although he had ample time to do so. In fact, the plaintiff testified that after he went home and called AAA and asked them to tow his car, he thought that was the end of the problem.