STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 CA 1139

LOVIE MARSHALL, AS CURATOR OBO EZEKIEL BLAKES, SR.,
AND EZEKIEL BLAKES, JR., AND TASHALL JONES,
INDIVIDUALLY

VERSUS

JEAN PAUL PALMER, XYZ INSURANCE COMPANY, JOHN DOE,
BATON ROUGE POLICE DEPARTMENT, BATON ROUGE POLICE
DEPARTMENT CHIEF JEFF LEDUFF, CITY OF BATON
ROUGE/PARISH OF EAST BATON ROUGE, RICHARD
COLEMAN, INTERSTATE BRANDS CORPORATION, MIASHA
PITTS, U.S. AGENCIES CASUALTY INSURANCE COMPANY
AND ACE AMERICAN INSURANCE COMPANY

Judgment Rendered: **MAY 0 4 2021**

* * * * *

On Appeal from the
19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Trial Court No. 576985

Honorable Todd W. Hernandez, Judge Presiding

* * * * *

J. Rodney Messina
Baton Rouge, LA

Anne E. Watson
Opelousas, LA

Attorneys for Plaintiffs-Appellants,
Tashall Jones, individually, Terry
Jones, individually, and Lovie
Marshall, as curator o/b/o Ezekiel
Blakes, Sr., and Ezekiel Blakes, Jr.

Alan Gregory Rome
Kim L. Brooks
Tedrick K. Knightshead
Joseph K. Scott, III
Gwendolyn Brown
Baton Rouge, LA

Attorneys for Defendants-Appellees,
City of Baton Rouge, Parish of East
Baton Rouge (Baton Rouge Police
Department)

Michael L. Glass
Alexandria, LA

Wilbert J. Saucier, Jr.
Pineville, LA

Attorneys for Cross-Claimant and
Intervenor-Appellants, Richard
Coleman and Shenandoah Coleman

\* \* \* \* \*

BEFORE: THERIOT, WOLFE, AND HESTER, JJ.

**HESTER, J.**

This matter is before us on appeal by plaintiffs, Lovie Marshall, as curator o/b/o Ezekiel Blakes, Sr. and Ezekiel Blakes, Jr., Tashall Jones, Terry Jones; cross-claimant, Richard Coleman; and intervenor, Shenandoah Coleman, from a trial court judgment rendered in favor of the City of Baton Rouge/Parish of East Baton Rouge in accordance with a jury verdict.

## FACTS AND PROCEDURAL HISTORY

In the early morning hours of July 10, 2008, Jean Paul Palmer, driving his fiancée's Dodge Stratus, picked up Tashall[1] Jones from her parent's house on Thomas Road near Baker, Louisiana. Tashall was in need of formula for her six-month-old son, Ezekiel Blakes, Jr., but did not have a vehicle. While Tashall asked her brother, Terry Jones, to stay at home with the infant, Terry insisted on going with Palmer and Tashall to the store. Terry got into the back seat behind Palmer, and Tashall got into the front seat with the infant without a car seat.[2] From Thomas Road, the Palmer vehicle headed to an area of Baton Rouge known as Mall City and left to pick up the infant's father, Ezekiel Blakes, Sr., who was to pay for the formula. Blakes got into the Palmer vehicle and sat in the back seat behind Tashall. Shortly after picking up Blakes, the Palmer vehicle was stopped by officers of the Baton Rouge Police Department ("BRPD") for failing to stop at a stop sign.

Before the stop, Officers Adam Lea, Thomas Morse, Jr., Robert Moruzzi, Scotty Canezaro, and Brett Hart were in a nearby parking lot after assisting another officer in the area in connection with a foot chase. Officer Canezaro saw the Palmer vehicle roll through a stop sign, and all the officers left the parking lot to make the traffic stop. Officer Patterson later joined the officers at the stop.

---

[1] At trial, Tashall testified that her name is Tashell but that she is often referred to as Tashall.

[2] Tashall testified that she had a car seat, but it was in her sister's car who was not at home at the time.

Officer Lea asked Palmer to exit the vehicle and asked for Palmer's license and/or identification. Palmer exited the vehicle and walked toward Officer Lea's unit. Palmer could only produce an identification card and admitted to Officer Lea that his license was suspended. Palmer's identification was ultimately handed to Officer Moruzzi who used the radio to check the status of Palmer's driver's license and to check for warrants. The inquiry revealed that Palmer had outstanding Baton Rouge City Court warrants, which are always misdemeanor or traffic warrants, and a 19th Judicial District Court ("JDC") traffic court warrant.

Officers Lea, Morse, Canezaro, and Hart all approached the Palmer vehicle during the stop and observed the occupants, including the infant being held by Tashall in the front seat with no car seat. Officer Hart and Morse spoke with Tashall about the infant and how dangerous it was to be transporting an infant without a car seat. Officers Lea, Morse, Hart, and Canezaro all directly interacted with Palmer during the stop in varying degrees. None of the officers observed or recalled anything during the stop that would lead them to believe that Palmer was impaired nor did they believe they had reasonable suspicion to conduct a field sobriety test.

Officer Canezaro ultimately ticketed Palmer for an expired inspection sticker, suspended license, and failure to have proper child restraint. After Palmer was warned and instructed not to drive the vehicle, all of the officers left the scene. No one remained on scene to ensure that Palmer did not drive away.

After the officers left the scene, the Palmer vehicle proceeded to the Cortana Wal-Mart to get the formula. Once the Palmer vehicle arrived at the Cortana Wal-Mart, the occupants discovered it was closed and decided to drive to the Wal-Mart on O'Neal Lane. The Palmer vehicle drove eastbound toward the 16000 block of the Florida Boulevard Service Road in route to the O'Neal Lane Wal-Mart.

A Volvo 18-wheeler truck operated by Richard Coleman was stopped on O'Neal Lane at the intersection of O'Neal Lane and the Florida Boulevard Service

4

Road, as the traffic light at O'Neal Lane and Florida Boulevard was red and Coleman could not pull up to Florida Boulevard without his truck and trailer blocking the service road. Once the light turned green, Coleman verified that the intersection was clear and slowly proceeded to cross the Florida Boulevard Service Road toward the intersection of O'Neal Lane and Florida Boulevard. Before Coleman was able to clear the intersection with the service road, he heard tires screeching, looked to his left, and saw the Palmer vehicle coming at him at a high rate of speed, which was later calculated to be approximately 65 miles per hour. The Palmer vehicle failed to stop at the stop sign at the intersection of the Florida Boulevard Service Road and O'Neal Lane and ran into the front right side of Coleman's truck.

As a result of the accident, Coleman sustained injuries to his head (concussion), neck (bulging disc), and left shoulder (torn rotator cuff and labrum). Additionally, all occupants of the Dodge Stratus sustained injuries: Ezekiel Blakes, Sr. suffered a severe and permanent brain injury, which rendered him disabled and dependent on the care of others for his lifetime. Tashall Jones suffered a fractured pelvis, which required surgery and physical therapy. Ezekiel Blakes, Jr. suffered a broken collar bone and a head injury, and Terry Jones suffered from shoulder pain and right knee pain after the accident.

Due to the seriousness of the injuries, the Traffic Homicide Unit of BRPD conducted a full investigation, which included the use of a blood kit to determine Palmer's blood alcohol concentration ("BAC"). It was later determined that Palmer's BAC was .21%, which was two and a half times the legal BAC limit of .08%.[3] Palmer was eventually arrested and charged with operating a vehicle while intoxicated (hereinafter "DWI") (second offense), first degree vehicular negligent

---

[3] Pursuant to La. R.S. 14:98(A)(1)(b), the crime of operating a vehicle while intoxicated is the operating of any motor vehicle when the operator's blood alcohol concentration is 0.08 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood.

injuring, and three counts of vehicular negligent injuring, as well as violations for child passenger restraint, his own safety belt use, driving under suspension, and failing to stop at a stop sign.

As a result of the accident, Lovie Marshall, as curator o/b/o Ezekiel Blakes, Sr. and Ezekiel Blakes, Jr., Tashall Jones, and Terry Jones[4] filed a petition for damages (the "Marshall plaintiffs") and named multiple defendants, including Palmer, the owner and insurer of the vehicle driven by Palmer, Coleman, BRPD,[5] an unidentified police officer, the police chief, and the City of Baton Rouge/Parish of East Baton Rouge ("City/Parish"). Coleman asserted a cross-claim against the City/Parish. His wife, Shenandoah Coleman, intervened and asserted her own claims against the City/Parish (the "Coleman plaintiffs"). The Marshall plaintiffs and the Coleman plaintiffs assigned fault to the police officer, an employee of BRPD, and the City/Parish, alleging that the officer was negligent in failing to detain or arrest Palmer at the initial stop at which time Palmer was impaired. Plaintiffs also alleged the City/Parish and BRPD negligently trained the officer.

Ultimately, the matter proceeded to a jury trial in 2018 against the sole remaining defendant, the City/Parish. At the conclusion of the nine-day trial, the jury returned a verdict, finding no liability on the part of the City/Parish by a vote of eleven to one. In accordance with the jury's verdict, the trial court signed a judgment on June 19, 2018 dismissing the claims of all plaintiffs against all defendants with prejudice.[6]

---

[4] Terry Jones was later added as a plaintiff pursuant to an amended petition.

[5] The City/Parish filed a peremptory exception asserting the objection of no cause of action, asserting that the BRPD is not a juridical entity capable of being sued, as it is merely a department of the City/Parish, citing **Roberts v. Sewerage & Water Board of New Orleans**, 634 So.2d 341, 346-47 (La. 1994). The trial court granted the City/Parish's exception.

[6] The June 19, 2018 judgment further reflected that a directed verdict was issued in favor of and dismissing the Chief of Police, Jeff LeDuff, prior to the rendition of the jury verdict and also reflected the trial court's finding that Richard Coleman was free from fault in the collision.

Thereafter, plaintiffs jointly filed a motion for judgment notwithstanding the verdict on the issues of liability and damages, which was denied by judgment dated March 13, 2019. The instant appeal followed. Plaintiffs assigned the following as errors:

Marshall Assignment of Error 1:
The jury erred in finding that plaintiffs failed to establish defendant's breach of the standard of care given the overwhelming evidence presented at trial by plaintiffs.

Marshall Assignment of Error 2/Coleman Assignment of Error I:
The jury erred in failing to find that the defendant police officers were negligent in failing to further investigate and arrest the intoxicated driver, Palmer, resulting in a horrible collision mere minutes after the traffic stop.

Marshall Assignment of Error 3/Coleman Assignment of Error II:
The jury erred in disregarding the uncontradicted expert testimony of both plaintiffs' and defendant's experts, given the absence of circumstances in the record that cast suspicion on the reliability of the testimony.

## LEGAL PRECEPTS

The liability of a police officer is determined using the duty-risk analysis. **Sacco v. Allred**, 2002-0141 (La. App. 1st Cir. 2/19/03), 845 So.2d 528, 533 (citing **Mathieu v. Imperial Toy Corporation**, 94-0952 (La. 11/30/94), 646 So.2d 318, 321-22). Under this analysis, a plaintiff must prove five separate elements in order for liability to attach: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). **Mathieu**, 646 So.2d at 322. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. **Van Cleave v. Temple**, 2018-1353 (La. App. 1st Cir. 5/31/19), 278 So.3d 1005, 1011.

There is an almost universal duty on the part of a defendant in negligence cases to use reasonable care so as to avoid injury to another. In some cases, the duty is refined more specifically that the defendant must conform his or her conduct to some specially defined standard of behavior. **Boykin v. Louisiana Transit Company, Inc.**, 96-1932 (La. 3/4/98), 707 So.2d 1225, 1231. The legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers are duty-bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. When a law enforcement officer becomes apprised of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to an unreasonable risk of harm. **Oubre v. Eslaih**, 2003-1133 (La. 2/6/04), 869 So.2d 71, 77. However, whether this duty exists and the scope of the duty depends on the specific facts and circumstances of the case and the relationship of the parties. **Davis v. Witt**, 2002-3102 (La. 7/2/03), 851 So.2d 1119, 1128 (citing **Socorro v. City of New Orleans**, 579 So.2d 931, 938 (La. 1991)).

While the scope of an officer's duty encompasses the choosing of a course of action which is reasonable under the circumstances, it does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach. **Davis**, 851 So.2d at 1127. In evaluating the reasonableness of an officer's actions, the existence of other available alternative methods does not, in and of itself, render the method chosen unreasonable. Officers are not required to exercise superhuman judgment but should be able to rely on their training and common sense. **Sacco**, 845 So.2d at 537. Accordingly, the ultimate question is whether the police officer's actions were reasonable under the totality of the circumstances. **Syrie v. Schilhab**, 96-1027 (La. 5/20/97), 693 So.2d 1173, 1177.

Whether the defendant owed the plaintiff a duty is a question of law. Whether the defendant breached that duty and whether that breach was a cause in fact of

8

plaintiff's injuries are factual questions to be determined by the factfinder. **Hanks v. Entergy Corporation**, 2006-477 (La. 12/18/06), 944 So.2d 564, 579-80.

A reviewing court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. In order to reverse a trial court's determination of a fact, a reviewing court must review the record in its entirety, find a reasonable factual basis does not exist for the finding, and then further determine the record establishes the factfinder is clearly wrong or manifestly erroneous. An appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. Nevertheless, the issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether the factfinder's conclusion was a reasonable one. **Hanks**, 944 So.2d at 580.

If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. If there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. **Hanks**, 944 So.2d at 580.

Nevertheless, where documents and objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the reviewing court may well find manifest error or clear wrongness even in a finding purportedly

9

based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. **Hanks**, 944 So.2d at 580.

The rule that questions of credibility are for the trier of fact also applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error. **Hanks**, 944 So.2d at 580-81.

The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. If a court finds that the trial court committed a reversible error of law or manifest error of fact, the court of appeal must ascertain the facts *de novo* from the record and render a judgment on the merits. **Oubre**, 869 So.2d at 76-77.

## DISCUSSION

In the Marshall plaintiffs' first and second assignments of error and the Coleman plaintiffs' first assignment of error, it is argued that the jury erred in failing to find that the police officers breached the standard of care and, consequently, were negligent in failing to further investigate and arrest Palmer at the time of the initial stop. Specifically, plaintiffs argue that the officers were negligent in not arresting Palmer after observing him run a stop sign and becoming aware of Palmer's suspended license and four outstanding warrants. Plaintiffs further find negligence in the officers only cautioning Palmer to not drive the car without remaining on scene to ensure Palmer's compliance. Additionally, plaintiffs argue that the officers acted

10

unreasonably under the circumstances in failing to ask Palmer if he had been drinking, failing to get close enough to him to smell his breath, failing to perform a field sobriety test, horizontal gaze test, or look into his eyes, and failing to tow the vehicle. The Marshall plaintiffs' third assignment of error and the Coleman plaintiffs' second assignment of error allege that the jury abused its discretion in rejecting the uncontradicted expert testimony and not finding fault on the part of the officers for failing to arrest Palmer. Given the interrelatedness of the assignments of error, we will address them together.

"Allowing" Palmer to Drive and Failure to Arrest

At the time that Palmer was initially pulled over by the officers on July 10, 2008, his license was suspended and he had four outstanding misdemeanor warrants. Palmer had three bench warrants issued by Baton Rouge City Court relative to the misdemeanors of speeding in a school zone, prohibited public drinking, and driving under a suspended license. Palmer also had one bench warrant issued by the 19th Judicial District Court for speeding, expired license, and illegal tint. Plaintiffs argue that Palmer should have been arrested and, consequently, taken off of the road as a result of these outstanding warrants. Despite the officers' beliefs to the contrary, plaintiffs argue that Palmer could have been arrested and taken to jail as a result of his outstanding warrants. Plaintiffs also relied upon a Policy and Procedure Manual of the Baton Rouge Police Department, providing that if an officer stops a traffic violator who is driving under a suspension according to the record of the Department of Public Safety ("DPS") and if the driver has no license on his person, the driver shall be issued a traffic citation for the appropriate charge and shall not be allowed to drive from the scene.

During the traffic stop, Officer Moruzzi was instructed by Officer Lea to have Palmer's identification run through the criminal information unit to check for Palmer's driver's license status and whether he had any warrants. Officer Lea

11

testified that the operators performing the information search would not provide information regarding Palmer's previous convictions, if any, unless the officer specifically asked. According to Officer Lea, such specific request would be rare and typically related to another charge and was not done in this case. However, the operators would inform them whether the warrants were felonies or misdemeanors.

Palmer previously admitted to the officers that his license was suspended, which was confirmed after his identification was run. Palmer was not in possession of his driver's license at the time of the stop. Pursuant to the departmental policies introduced as an exhibit at trial, he was to be issued a citation for the appropriate charge and not allowed to drive away. Officer Canezaro issued a citation for suspended license, among other charges. The officers testified that they did not "allow" Palmer to drive away; rather, the officers took enforcement action designed to change driver behavior: they counseled Palmer and warned him of the dangers of continuing to drive, they issued Palmer a traffic citation, and they told him that he could not drive.

Plaintiffs argue that it was unreasonable for the officers to not ensure, in some way, that Palmer did not drive away in the vehicle in light of his suspended license and the fact that there was an unrestrained infant in the vehicle. According to plaintiffs' expert in the areas of police policy, procedure, and practices, Dr. W. Lloyd Grafton, Palmer was not issued the appropriate charge and drove away from the scene.[7] As Dr. Grafton further explained, if all applicable policies would have been followed, Palmer would have been arrested and would not have been allowed to drive off. Notwithstanding, Dr. Grafton's testimony never concluded that the

---

[7] This opinion was not explained, other than Dr. Grafton did not believe that the officers issued all of the appropriate charges. However, the referenced policy states that "[i]f the operator has an expired license or no license on his person, he shall be issued a traffic citation for the appropriate charge." This policy does not state that he shall be issued all possible charges. Nevertheless, other sections of BRPD's policies reference the issuing a citation for all violations, but give an officer the discretion to issue a warning in lieu of citation.

officers were required to arrest Palmer; rather, it was that Palmer could be arrested under the applicable policy and the circumstances. In his opinion, Palmer should have been arrested.

Plaintiffs also suggested that the officers should have towed the vehicle, which would have prevented Palmer from driving it away that morning. While the officers mentioned to Palmer during the stop that they could have the car towed, they did not intend to tow it; they were attempting to keep Palmer from driving again. Further, Officer Lea testified that he could not have towed the vehicle for the violations he knew at the time, and Officer Hart testified that an officer was required to get supervisor permission in order to tow a vehicle, which was not a favored procedure. Lack of insurance is a towable offense, but it is not required that it be towed. Instead, a green sticker is typically placed on the back windshield of the vehicle for lack of insurance, and vehicles are only towed for a switched license plate or if it was improperly registered. Notably, Dr. Grafton testified that the officers were not required to tow, but could have towed the Palmer vehicle under the applicable policies.[8] Instead of towing the vehicle, Dr. Grafton believed that Palmer should have been arrested as a result of the stop.

However, as testified by Officers Morse and Lea, under the circumstances, there was nothing more they could do except tell him that he could not drive from the scene. Officer Morse spoke with the passengers and informed them that they needed to find someone to come get them, since none of them had licenses. Palmer and the passengers were within walking distance (ten to fifteen minutes) of where they had just left. In Officer Morse's view, there were four adults who could either walk home or make arrangements for someone to come get them. Officer Hart

---

[8] Officer Lea testified that an insurance card was not shown at the stop and he did not know at the time whether there was insurance on the vehicle. Notwithstanding, Palmer testified that the vehicle, owned by his girlfriend, did have insurance.

13

testified that he would not have driven anyone in his unit, and none of the officers could drive with an unrestrained infant in their police unit.

Nonetheless, plaintiffs argue that the officers could have and should have made arrangements for the passengers, which is permitted when a driver has been arrested. BRPD's policy indicates that it is not always an arresting officer's responsibility to make arrangement for passengers in a violator's vehicle; several factors, including age, level of intoxication of the passenger, and the location of the arrest, must be taken into consideration.[9] No arrest was made during this traffic stop, but Officer Lea testified that they could have allowed the passengers to use one of the officers' cell phones if they had asked. Officer Hart also testified that if someone asks for help – if they are stranded – he would call a number for them in order to help. Officer Morse, who spoke with the passengers for quite some time, testified that no one in the vehicle asked for help or any assistance, and Officer Canezaro also stated that no one asked for help. Officer Canezaro further testified that there was nothing to prevent him or the other officers from staying with the Palmer vehicle until someone came to help the occupants of the vehicle.

While the officers instructed Palmer not to drive the vehicle, toward the end of the stop, Palmer stated that he would just go straight to the store, get the formula, and go straight home.[10] However, Officer Morse then explained to Palmer that he could not do that, to which Palmer stated that the officer was correct and told the officers they would not see him driving this car again. In contrast, Tashall testified that she neither heard the officers tell Palmer not to drive nor did she understand that they were not to leave. She further testified that the officers let them go. Terry also

---

[9] Everyone in the Palmer vehicle, except the infant, was an adult, and both of the infant's parents were in the vehicle. There was no testimony indicating that any of the passengers of the vehicle were intoxicated. The traffic stop was located within walking distance (ten to fifteen minutes) of where Palmer had just picked up Blakes. Additionally, both Terry and Tashall testified that Blakes and Terry were willing to walk back with the infant after the stop.

[10] According to Officer Hart, Palmer phrased the statement as a question to the officers, and the officers told him that he could not drive.

testified that the officers warned them that the car could not move without the baby in the car seat. According to Terry, Blakes was going to walk with the baby back to his sister's place, and Terry was going to walk with him. However, Terry stated that the officers told Blakes to put the baby in the backseat and he would not have to walk.

Despite Palmer's outstanding warrants, Officers Morse, Canezaro, and Hart testified that they were unable to arrest Palmer based on those warrants, none of which were felonies. There was no way at 2:00 a.m. to verify the city court warrants, which is necessary to confirm that the warrants are still active prior to arrest, and the officers testified that no jail would accept Palmer based on his warrants. Moreover, the one district court warrant of Palmer that could have been verified was a traffic warrant and not for any misdemeanor crime.[11]

To impeach the testimony of the officers regarding their ability to arrest Palmer on the morning of July 10, 2008, based on his misdemeanor and traffic warrants, plaintiffs called Lieutenant James Sandridge of the East Baton Rouge Sheriff's Office. Lieutenant Sandridge was the supervisor over booking, bond records, and clarification and was familiar with the sheriff's policy with respect to which people would be accepted in the East Baton Rouge Parish Prison ("Parish Prison"). According to his testimony, when Sid Gautreaux was elected as sheriff in December of 2007, the preexisting policy regarding the types of arrestees that could be brought to Parish Prison was changed. In 2008, Parish Prison would accept misdemeanor traffic arrestees, including those with outstanding warrants.

Lieutenant Sandridge was asked whether the officers could have arrested an individual and brought him to Parish Prison if he had outstanding warrants and

---

[11] Lieutenant Sandridge, the supervisor over booking, bond records, and clarification at the East Baton Rouge Sheriff's Office, testified that the sheriff's office could not verify a city constable warrant but could verify a 19th JDC warrant.

15

committed a crime at 2:00 a.m. on July 10, 2008, to which Lieutenant Sandridge responded, "Yes." He further testified that as long as an individual had an active, confirmed warrant and he was medically cleared by the medical department, the individual would have come to Parish Prison if arrested. The officers, therefore, had the ability to take an individual to Parish Prison, even if all he had were traffic warrants, and Parish Prison would have taken them, according to Lieutenant Sandridge. Nevertheless, Lieutenant Sandridge admitted it was within an officer's discretion whether to arrest someone on a traffic warrant. Further, he could not recall whether he was working on July 10, 2008, at 2:00 a.m., and had no idea how many male inmates were at Parish Prison at that time.

Officer Hart later testified that the officers could not have arrested Palmer for his four outstanding warrants as three were city court warrants, which could not be confirmed at 2:00 a.m., and the district court warrant was for traffic violations. The testimony of Lieutenant Sandridge regarding the open door policy of Parish Prison under Sheriff Gautreax was mentioned to Officer Hart. Officer Hart testified that in July of 2008 he was only aware of a new policy on certain misdemeanors through the 19th JDC, including misdemeanor domestic matters, battery on a police officer, or any violent misdemeanor, which would allow an officer to call and obtain permission from Parish Prison. Under this new policy, the officer would have to explain the charges they had on an individual to find out if Parish Prison would take them.[12] However, Officer Hart stated that he had never been able to book anyone on a traffic warrant, and disagreed with Lieutenant Sandridge's testimony otherwise.

---

[12] Officer Hart also testified that they (BRPD) have always had this battle with the sheriff, as they do not have their own jail and must use Parish Prison. The policies would often change. The sheriff prior to Sheriff Gautreaux would not allow a BRPD officer to book anybody with a misdemeanor. Later, this policy changed for certain misdemeanors (not traffic violations), but the officers were still required to obtain permission in order to book an individual. Officer Hart explained that Parish Prison is used to hold everyone – murderers, rapists, and robbers alike – and they always had problems with trying to put someone in Parish Prison for a lesser crime, much less a traffic offense, because it takes up a bed that may be needed for felony arrestees.

He clarified, stating that an officer would be able to arrest and book for traffic warrants during special operations when the jails are kept open and extra manpower is present because that was the target and purpose of the special operations.

Plaintiffs could cite to no law or case,[13] nor was any evidence submitted at trial, to establish that the officers were required to arrest Palmer based on his outstanding warrants or on the traffic offenses committed prior to the traffic stop. In fact, plaintiffs' expert did not testify that the officers were *required* to arrest Palmer; rather, Dr. Grafton testified that he thought that Palmer *should* have been arrested. Both police policy and procedure experts – Dr. Grafton and the City/Parish's expert, George Armbruster – testified that the officers *could* have arrested Palmer at the traffic stop under the circumstances. The experts also acknowledged that the BRPD policy permitted the officers, at their discretion, to issue a warning in lieu of a citation after a traffic stop.

Plaintiffs specifically argue that Armbruster confirmed that Palmer should have been arrested in the following exchange at trial:

> **Q.** All right. So as far as you're concerned, it may have been unreasonable to advise Mr. Palmer not to drive and then assume he was not going to drive even though he'd already been driving illegally earlier; correct?
>
> **A.** You're saying you want me to admit that that was unreasonable on the part of these officers?
>
> **Q.** I'm asking you if that's a possibility that it was unreasonable for them to advise Mr. Palmer not to drive and then assume he was not going to drive even though he'd been driving illegally earlier?
>
> **A.** Based on what I know now, yes.

Despite plaintiffs' arguments, Armbruster did not confirm that Palmer should have been arrested. Armbruster agreed that it was a possibility that it was unreasonable for the officers to advise Palmer not to drive and then assume he would comply. He

---

[13] While plaintiffs rely on the criminal case of **State v. Hill**, 1997-2551 (La. 11/6/98), 725 So.2d 1282, 1286, to support the argument that the officers were "derelict" for not arresting Palmer, such reliance is misplaced. The **Hill** case simply provides that discovery of an outstanding arrest warrant supplies probable cause to arrest and does not mandate that the officers were required to arrest Palmer in this case.

was not asked after this exchange what the officers should have done instead. Ultimately, the jury was required to determine, based on all the evidence and testimony, whether the officers' decision not to arrest Palmer was reasonable under the totality of the circumstances.[14]

Investigating for DUI

Plaintiffs argue that the officers failed to take any reasonable measures to investigate Palmer for DWI. Had the officers done so, they argue that Palmer would have been arrested for DWI, as his BAC was tested less than three hours later and was .21%. Plaintiffs' expert toxicologist, Dr. William George, testified that alcohol is a unique drug in that it has a particular time it takes after you inject it until your body reaches its highest level. Palmer's BAC could have been less or could have been more at the time of the traffic stop, depending on the timing of the last intake of alcohol. Palmer's blood was drawn after the accident at the hospital at 4:48 a.m., and part of his testimony indicated that his last intake of alcohol occurred about an hour before the traffic stop. Assuming this was correct, Dr. George was able to calculate that Palmer's BAC at the time of the traffic stop was approximately .256%.

The testimony on Palmer's alcohol intake, however, was less than clear. Palmer testified that after he awoke on the afternoon of July 9, 2008, around 4:00 p.m., he drank some beer[15] and about a half of a pint of gin. Additionally, he confirmed that he took three hits of ecstasy. At trial, Palmer could not recall whether he had anything to drink on his way to pick up Tashall and Terry or after he picked

---

[14] We note that Lieutenant Sandridge testified that he thought that Sheriff Gautreaux sent out a memo to the sheriff's office as well as all other agencies informing them of the new policy to "take everything," *i.e.*, accept medically cleared arrestees based on all types of active, confirmed warrants. Further, in his report, Armbruster relied upon references to a memo to BRPD officers that because of jail overcrowding the officers were unable to arrest for misdemeanor offenses. Officer Hart testified that he was aware of a memo from Sheriff Gautreaux regarding the ability to book persons for outstanding warrants related to certain misdemeanor offenses, *e.g.*, domestic matters, battery on a police officer, or any violent misdemeanors. None of the referenced memos were offered into evidence.

[15] Tashall testified that when Palmer first came to her parent's house on the afternoon of July 9, 2008, both she and Palmer consumed one beer.

18

them up in the early morning hours of July 10, 2008, but his deposition testimony indicated that he did not. Later during his testimony, Palmer confirmed that he had a half of a pint of gin in his car after he pulled away from the traffic stop, after which the following colloquy ensued:

**Q.** Did you drink it on the way when they let you go?

**A.** No, sir.

**Q.** So you drank a half pint of gin when you left that – when the police let you go and you left the traffic stop?

**A.** Not all of it, no.

**Q.** Did you drink most of it?

**A.** Some of it.

At the request of counsel, the trial court instructed Palmer on perjury, informed Palmer that it is a crime to testify untruthfully under oath, and reminded him that he was under oath at his deposition, and was under oath at trial. Palmer was then reminded of his deposition testimony that he did not drink after the traffic stop and asked again whether he did or did not drink after the traffic stop. Palmer testified that he did not recall. When asked if Palmer drank anything after the traffic stop, Tashall and Terry testified that they did not see Palmer drinking and could not recall if there was a half pint of gin in the car. They also indicated that they did not smell alcohol. However, Tashall's deposition testimony stated that Palmer had a bottle of gin in the car. Even though she was sitting next to Palmer in the car, she testified that she might not have seen him drink the bottle of gin but also stated that she could not recall.

The officers admitted that they either did not ask Palmer whether he had been drinking that night or did not recall if anyone asked the question. Palmer could not recall if he was asked whether he had been drinking. Additionally, Dr. Grafton and Armbruster viewed the video and did not hear anyone ask whether Palmer had been drinking. Officer Canezaro, who observed the stop sign violation, testified that he did not remember anyone asking Palmer if he had been drinking and further testified

19

that it was not standard to ask. Whether to ask that question would be determined on a case-by-case basis: if there was an obvious sign of impairment, the question would be asked, but if it was a standard traffic stop, it may not be asked.[16] Officer Canezaro also testified that it would not be unusual for the question to be asked of a driver who failed to stop at a stop sign at 2:00 a.m.

According to the testimony of Officers Lea, Morse, Hart, and Canezaro, all of whom interacted with Palmer, Palmer did not exhibit signs of intoxication or provide reasonable suspicion in order to conduct a field sobriety test at the time of the traffic stop. Officer Lea explained that he would look for signs of intoxication – poor balance, slurred speech, glassy eyes, and the odor of alcohol – in order to determine whether he had reasonable suspicion to investigate further. However, if these signs are not observed, it would not rise to the level of a DWI investigation.

According to Officer Lea, Palmer stopped and pulled over at the first available safe spot on the side of the road after Officer Lea turned his lights on. Palmer immediately complied with Officer Lea's command to exit the vehicle and walked to Officer Lea's unit without stumbling or swaying. Palmer's speech was not slurred. Furthermore, Palmer was able to bend down flatfooted to drop his outer pants and retrieve his identification card from a second pair of pants he wore without swaying or losing his balance. He later pulled his outer pants back up and had no issue doing so.

Nevertheless, Plaintiffs and their experts noted that Palmer kept his hands on Officer Lea's police unit nearly the entire time during the stop. Officer Hart, who at the time of trial had seventeen years with BRPD, testified that Palmer very lightly

---

[16] Officer Hart testified that they were actually doing criminal patrol and trying to make an arrest, as evidenced by their checking Palmer for warrants and trying to determine if they smelled marijuana in the car, which they did not. Officer Morse further stated that the purpose of this traffic stop at 2:00 a.m. was multi-fold. The main purpose was enforcement and being proactive, which includes looking for people with warrants, looking for drunk drivers, looking for drugs and guns in the vehicle, and traffic enforcement.

had his hands on the police unit, which was not the entire duration of the stop. Officer Hart noted that, at times, Palmer gestured, walked around the unit toward Officer Canezaro and then walked back. According to Officer Hart he could tell the difference between someone using something for support or if they were putting their hands on the hood for safety because that is what one does when stopped by the police. Officers Canezaro and Moruzzi also testified that it was not uncommon for people to lean against the police unit or "assume the position," especially in the area of the traffic stop.

At trial, Officer Hart's attention was drawn to the fact that the expert toxicologist testimony estimated that at the time of the stop Palmer would have had an approximate BAC of .256% (based on the assumption that Palmer had his last drink an hour before the stop) and took three hits of ecstasy earlier. Officer Hart was asked why he would not have noticed anything about his intoxication. Officer Hart plainly noted that "[h]indsight is great, but at the time, he didn't give me any indication that he was intoxicated."

Plaintiffs further argue none of the officers got close enough to Palmer in order to detect the smell of alcohol on Palmer or be able to determine if his eyes were glassy or bloodshot. According to their testimony, Officer Lea got within four to five feet of Palmer; Officer Canezaro was within three feet of Palmer; Morse got as close as two to three feet; and Hart estimated that he got as close as one-and-a-half to two feet. All testified that they were close enough to detect the smell of alcohol if present and to observe whether Palmer's eyes were glassy or bloodshot, but the officers did not detect the smell of alcohol and did not observe glassy or bloodshot eyes. According to Dr. Grafton, plaintiffs' expert in police procedures, no officer got close enough to Palmer to smell alcohol based on his viewing of the video of the traffic stop. Dr. Grafton also testified that "everybody knows there's

21

alcohols that don't have an odor," and agreed that gin, which is what Palmer testified to drinking earlier, would not be the most odorous of all the liquors.

Notably, Dr. George, plaintiffs' expert toxicologist, testified that with a BAC of .10%, a naïve or light drinker would be profoundly affected, *i.e.*, falling over drunk, while a heavy drinker may not be. Dr. George did not know what type of drinker Palmer was, but he could say based on the testimony and his observations that Palmer was not a naïve drinker. Palmer's BAC was .21% when his blood was drawn at 4:48 a.m., not long before the accident investigator, Officer James Pittman arrived at the hospital and spoke with Palmer. While Officer Pittman could detect an odor of alcohol,[17] Palmer spoke in a normal tone without slurring and did not otherwise exhibit any of the obvious signs of impairment. Additionally, Officer Pittman viewed the video of the traffic stop in the course of his investigation and he did not find that Palmer appeared to be drunk at the time of the stop, as he did not stumble or fall and his speech was not slurred.

Dr. Grafton opined that the officers should have conducted a field sobriety test and that the officers violated general policies and procedures in failing to get close enough to Palmer and view his eyes in light of the fact that the officers were looking for people driving under the influence that night. In contrast, Armbruster opined that the officers followed their training and followed their policies and did not commit any violation in failing to conduct a field sobriety test on Palmer. Armbruster further testified that simply because a stop sign is run at 2:00 a.m. does not mean that the stop is automatically a DWI investigation; rather, an officer would need to develop facts that would lead him to believe that the driver is intoxicated. In fact, it would be improper procedure to immediately approach the driver to smell his

---

[17] Officer Pittman smelled alcohol on Palmer in his hospital room, but noted that he was inside a confined room with Palmer and that it is harder to smell alcohol on someone's breath when you are outside due to wind and other elements.

22

breath based on the running of a stop sign at 2:00 a.m. Dr. Grafton even acknowledged that not every stop is a DWI traffic stop, as that must be determined through further observation. Based on his viewing of the video and the officers' testimonies, Armbruster opined that they did not have reasonable suspicion that Palmer was intoxicated.

As noted above, when an officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to an unreasonable risk of harm. **Oubre**, 869 So.2d at 77. Whether this duty exists and the scope of the duty depends on the particular facts and circumstances of the case and the relationship of the parties. **Davis**, 851 So.2d at 1128; **Syrie**, 693 So.2d at 1177. Importantly, the scope of an officer's duty includes the selection of a course of action that is reasonable under the circumstances, but does not extend so far as to require the "best" or "better" method of approach. **Davis**, 851 at 1127; **Syrie**, 693 So.2d at 1177.

At trial, plaintiffs showed the officers at the traffic stop did not adhere to all applicable police policies and procedures, including failing to ask for insurance and the positioning of Palmer and the police unit. In light of Palmer's suspended license, the applicable policy indicated that Palmer not be allowed to drive away. Plaintiffs' expert opined that in order to not allow Palmer to drive away, he should have been arrested. The officers, however, testified that they took appropriate and customary enforcement action by admonishing and warning Palmer not to drive.[18] Plaintiffs' expert testified and the City/Parish's expert admitted that it may not have been

---

[18] Officer Hart testified that he stops a lot of people during the night shift who do not have a valid license for whatever reason – about half of the time people have invalid licenses. He also stated that lack of proper child restraint is very common in First District (the location of the traffic stop). Officer Hart had never arrested someone for these offenses unless there was some other felony involved. Additionally, Officer Pittman testified that it was typical and permissible to write a citation to a driver with a suspended license and let them go. He also testified that there are a lot of people driving around Baton Rouge with a suspended license that are issued citations and let go. In fact, Officer Pittman explained that, unfortunately, the same is often done with possession of marijuana: "We write [a] summons and let them go."

23

reasonable under the circumstances to advise Palmer not to drive and assume that he would not drive.

Plaintiffs' expert further opined that the officers violated policy in failing to arrest Palmer and in failing to investigate Palmer for DWI. However, the jury heard conflicting testimony regarding the feasibility and practicalities of arresting someone with only a traffic warrant. Despite plaintiffs' arguments, Lieutenant Sandridge's testimony was not "uncontradicted." At best, it was established that the officers *could* have arrested Palmer as a result of the traffic stop, but there was no "uncontradicted" testimony that the officers were *required* to arrest Palmer. The jury also heard the testimony of Officers Lea, Morse, Hart, Moruzzi, and Canezaro that they did not observe anything Palmer did that would give them reasonable suspicion to conduct a field sobriety test. Officer Pittman further reiterated that Palmer did not have any obvious signs of impairment. Also, it was not clear whether or not Palmer drank from a pint of gin in the car after the traffic stop.

While the jury was presented with multiple alternative and viable courses of action that could have been better than the course of action taken by the officers at the traffic stop on July 10, 2008, the question remained whether the course of action taken by the officers was reasonable under the specific facts and circumstances presented at the time. See **Sacco**, 845 So.2d at 537 (the existence of other available alternative methods does not, in and of itself, render the method chosen unreasonable). The jury listened to and observed all of the fact and expert witnesses, weighed the evidence, made credibility determinations, and viewed the video of the traffic stop in whole and in part numerous times throughout the trial. In this unfortunate case, we are unable to replace our opinion with the opinion of the jury and are constrained to rely upon the jury's view of the conflicting testimony and evidence. See **Hanks**, 944 So.2d at 580. We find no manifest error in the jury's findings, and do not find merit in any of the assignments of error raised by plaintiffs.

24

## CONCLUSION

In light of the foregoing, we affirm the trial court's June 19, 2018 judgment dismissing the claims of Lovie Marshall, as curator o/b/o Ezekiel Blakes, Sr. and Ezekiel Blakes, Jr., Tashall Jones, Terry Jones, and Richard and Shenandoah Coleman against the City of Baton Rouge/Parish of East Baton Rouge with prejudice. All costs of this appeal are assessed to plaintiffs, Lovie Marshall, as curator o/b/o Ezekiel Blakes, Sr. and Ezekiel Blakes, Jr., Tashall Jones, Terry Jones, and Richard and Shenandoah Coleman.

**AFFIRMED**.